UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TIMOTHY DAILEADER,

                              Plaintiff,

        - against -

CERTAIN UNDERWRITERS AT LLOYD'S
LONDON – SYNDICATE 1861,
SUBSCRIBING TO POLICY NO.
ANV122398A; CRUM & FORSTER
SPECIALTY INSURANCE COMPANY;
CERTAIN UNDERWRITERS AT LLOYD'S
SUBSCRIBING TO POLICY NUMBER
DOH00746111; and STARSTONE
SPECIALTY INSURANCE COMPANY,

                              Defendants.

**MEMORANDUM
OPINION & ORDER**

22 Civ. 5408 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Timothy Daileader moves for a preliminary injunction requiring

Defendant Certain Underwriters at Lloyd's London – Syndicate 1861, Subscribing to Policy No.

ANV122398A ("Syndicate 1861") to pay his defense expenses as incurred in three adversary

proceedings against Daileader pending in the U.S. Bankruptcy Court for the District of South

Carolina.  (Pltf. Mot. (Dkt. No. 41))

        Daileader is a former director and manager of Oaktree Medical Center, LLC,

Oaktree Medical Centre PC, and Labsource, LLC (collectively, "Oaktree" or "Debtors").

Defendants Syndicate 1861, Crum & Forster Specialty Insurance Company, Certain

Underwriters at Lloyd's Subscribing to Policy Number DOH00746111 ("DOH00746111

Subscribers"), and Starstone Specialty Insurance Company (collectively, the "Excess Insurers")

sold excess director and officer ("D&O") insurance policies to Oaktree.  The excess policies

follow the form of Oaktree's primary D&O policy, which was issued by Landmark American Insurance Company (together with the Excess Insurers, the "Insurers").

The First Amended Complaint seeks a declaratory judgment that the Insurers have a duty to defend and to indemnify Daileader in connection with the adversary proceedings and asserts claims for breach of contract, bad faith coverage denial, and breach of the implied covenant of good faith and fair dealing.  (First Am. Cmplt. ("FAC") (Dkt. No. 15))[1]

Pending before the Court is Daileader's motion for a preliminary injunction requiring Syndicate 1861 to pay his defense costs.  (Pltf. Mot. (Dkt. No. 41); Pltf. Br. (Dkt. No. 42))

For the reasons that follow, Daileader's motion for a preliminary injunction will be denied.

## BACKGROUND

Plaintiff Daileader is a "[s]enior investment professional and manager" at Drivetrain, LLC.  Daileader Biography, available at https://www.drivetrainllc.com/tim-daileader. Drivetrain is "a fiduciary services firm comprised of investment professionals who serve as independent directors of outside companies, which often are financially distressed."  (Pltf. Supp. Br. (Dkt. No. 77) at 6-7[2] (citing Drivetrain:  What We Do, available at https://www.drivetrainllc.com/what-we-do))  Daileader was retained to serve as "a co-Manager at Oaktree Medical Centre, LLC; Manager at Labsource, LLC; and [as] the sole, independent director of Oaktree Medical Centre PC."  (FAC (Dkt. No. 15) ¶ 32)

---

[1] Daileader filed a Second Amended Complaint ("SAC") on February 21, 2023.  (Dkt. No. 81)  Because the FAC was the operative complaint when Daileader moved for a preliminary injunction, and because the SAC does not contain new allegations that change the analysis of Syndicate 1861's duty to defend, this Court will cite to the FAC in this decision.

[2] The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

The FAC alleges that Defendant Crum & Forster "is an insurance company organized under the laws of the State of Delaware with its principal place of business in Morristown, New Jersey" and that Defendant StarStone "is an insurance company organized and existing under the laws of the State of Delaware with its principal place of business in Jersey City, New Jersey." (FAC (Dkt. No. 15) ¶¶ 9, 11) The FAC does not allege the residency of Defendants Syndicate 1861 or Certain Underwriters at Lloyd's Subscribing to Policy Number DOH00746111. The Court understands that they are syndicates consisting of numerous individual and entity subscribers. (See Jan. 26, 2023 Joint Ltr. (Dkt. No. 65) at 1)

Jurisdiction is premised on federal question, bankruptcy, and supplemental jurisdiction under 28 U.S.C. §§ 1331, 1334(b), and 1367. (FAC (Dkt. No. 15) ¶ 13)

## I.    FACTUAL BACKGROUND

### A.    Daileader's Involvement with Oaktree

"Oaktree was a group of affiliated companies that provided pain management healthcare services. . . . Oaktree Medical Centre PC was a pain management practice that was privately owned by a non-practicing chiropractor, Daniel McCollum. Labsource LLC was Oaktree's toxicology laboratory. Oaktree Medical Centre, LLC was Oaktree's management service organization." (FAC (Dkt. No. 15) ¶ 33)

In 2018, Oaktree defaulted on a loan. Fidus Investment Corporation, the lenders' collateral agent, exercised its rights under the loan agreement to remove McCollum's control over Oaktree and appoint new leadership. On July 12, 2018, Fidus appointed Daileader as sole director of Oaktree Medical Centre PC and sole manager of LabSource, LLC. (See Unanimous Written Consent of the Sole Stockholder of Oaktree Medical Centre PC (Dkt. No. 79-2) at 3; Unanimous Written Consent of the Member of LabSource, LLC (Dkt. No. 79-4) at 2). On December 21, 2018, Fidus appointed Daileader as co-manager of Oaktree Medical Centre, LLC,

and on June 20, 2019, Fidus removed McCollum as the other co-manager, leaving Daileader as the sole manager.  (Written Consents of the Sole Member of Oaktree Medical Centre, LLC (Dkt. Nos. 79-6, 79-8))

As Oaktree Medical Centre PC's sole director, Daileader was "empowered to do and perform such . . . acts and things . . . as necessary or advisable."  (Unanimous Written Consent of the Sole Stockholder of Oaktree Medical Centre, P.C. (Dkt. No. 79-2) at 3)  As manager of LabSource and Oaktree Medical Centre, LLC, Daileader had "full and complete authority, power, and discretion to manage and control the business of [those] [c]ompan[ies]." (LabSource, LLC Operating Agreement (Dkt. No. 79-10) at 11-13; Oaktree Medical Centre, LLC Operating Agreement (Dkt. No. 79-11) at 4)  The amended adversary complaints allege that Daileader was "vested . . . with corporate authority and control over all day-to-day management, financials, and operations of [Oaktree]."  Fort v. Daileader, Adv. Proc. 21-80057-hb, Am. Cmplt. (Dkt. No. 33) ¶ 22 (Bankr. D.S.C.).[3]

B.    **The Policies**

At the time of Daileader's July 12, 2018 appointment as sole director of Oaktree Medical Center PC, Oaktree had a $1 million primary D&O policy issued by Landmark. (Landmark Policy (Dkt. No. 43-1))  Daileader states that – as a condition to his appointment – he "requested that Oaktree purchase additional D&O liability coverage" (Pltf. Supp. Br. (Dkt. No. 77) at 7), and that  Oaktree obtained excess policies from the Excess Insurers amounting to a "tower" of $10 million in coverage.  (See Syndicate 1861 Policy, Crum & Forster Policy, DOH00746111 Subscribers Policy, and StarStone Policy (Dkt. Nos. 43-2 – 43-5); FAC (Dkt. No.

---

[3]  Although there are three adversary proceedings pending against Daileader, the complaints in each are essentially identical, and the parties do not differentiate among the complaints in their briefing.  Accordingly, the Court cites one representative complaint when discussing all three.

15) ¶¶ 16, 19-22)  The excess policies all follow the form of the Landmark Policy, "which means that they incorporate by reference [its] terms and conditions."  (FAC (Dkt. No. 15) ¶ 23)

The Syndicate 1861 Policy – which is the policy at issue in connection with Daileader's preliminary injunction motion – is the "first-layer excess policy," providing up to $1 million in coverage after the $1 million in coverage under the Landmark Policy has been exhausted.  (Id. ¶ 19)  The initial coverage period of the Syndicate 1861 Policy was August 22, 2018 to July 9, 2019.  Syndicate 1861 subsequently extended the coverage to January 9, 2020 by endorsement.  (Syndicate 1861 Policy (Dkt. No. 43-2) at 3, 24-25)  Oaktree's insurance broker paid Syndicate 1861's agent the full premiums for the initial policy and coverage extension on October 31, 2018 and August 12, 2019, respectively.  (Feb. 2, 2023 ANV Email (Dkt. No. 70-3))

The Syndicate 1861 Policy provides liability coverage for directors and officers and for Oaktree, with directors and officers receiving priority payment.  (Landmark Policy (Dkt. No. 43-1) at 41-42, 45)[4]

As to the duty to defend, the Syndicate 1861 Policy provides that "[i]t shall be the right and duty of the Insurer to defend any Claim against any Insured for which coverage applies."  (Id. at 25) (emphases in original)

As to D&O coverage, the Syndicate 1861 Policy provides that "if a Claim for a Wrongful Act is first made against any Insured Person during the Policy Period and reported in accordance with [the applicable conditions], the Insurer will pay on behalf of such Insured Person all Loss such Insured Person is legally obligated to pay, except and to the extent that the

---

[4] Because the Syndicate 1861 Policy follows the form of the Landmark Policy, this Order generally cites the Landmark Policy when discussing the Syndicate 1861 Policy.

Insured Organization is required or permitted to indemnify such Insured Person for such Loss." (Id. at 41)

"Claim" is defined in the Policy as (1) [a] written demand for monetary or non-monetary relief; or (2) [a] civil, criminal, administrative, regulatory or arbitration proceeding, or arbitration demand for monetary or non-monetary relief which is commenced by [r]eceipt or service of a complaint or similar pleading." (Id. at 42 (list formatting and numbering altered)) "All Claims based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions, or events, or the same or related series of facts, circumstances, situations, transactions or events, shall be deemed to be a single Claim for all purposes under [the Policy]." (Id. at 15)

"Wrongful Act means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by [a]n Insured Person acting in his or her capacity as such and on behalf of the Insured Organization or any matter claimed against them solely by reason of their status as an Insured Person." (Id. at 43 (list numbering and formatting altered))

"Loss means damages, settlements, judgments (including pre- and post-judgment interest on a covered judgment) and Defense Expenses." (Id. at 42) "Defense Expenses means reasonable and necessary legal fees and expenses incurred, with the Insurer's consent, by any Insured in defense of a Claim, including any appeal therefrom." (Id. at 13)

The Policy contains the following Bankruptcy/Insolvency Exclusion:

The Insurer shall not be liable to make any payment for Loss under this policy in connection with any Claim made against any Insured:

1. Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, any Wrongful Act that is alleged to have caused, directly or indirectly, in whole or in part:

a. The bankruptcy or insolvency of the <u>Insured Organization</u>;

b. The <u>Insured Organization's</u> filing of a petition, or a petition being filed against the <u>Insured Organization</u> pursuant to the federal Bankruptcy Code or any similar state law;

c. The <u>Insured Organization</u> assigning its assets for the benefit of its creditors; or

d. By any other means seeking protection under the common or statutory law as a result of insolvency or financial impairment.

2. Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, the <u>Insured Organization</u> having sustained a financial loss due to a <u>Wrongful Act</u> by or on behalf of any <u>Insured Person</u> that actually or allegedly occurred before the date that the <u>Insured Organization</u> or other party sought protection of the <u>Insured Organization['s]</u> assets by any means . . . .

3. Brought or maintained by or on behalf of any creditor or debt-holder of the <u>Insured Organization</u>, or any <u>Claim</u> arising out of any actual or alleged <u>Wrongful Act</u>, where such <u>Wrongful Act</u> actually or allegedly results in the <u>Insured Organization's</u> failure, refusal or inability to pay debts or amounts due and owing, including but not limited to <u>Claims</u> alleging misrepresentation in connection with any extension of credit or in connection with the purchase or sale of a debt instrument, or <u>Claims</u> alleging any <u>Wrongful Acts</u> where such <u>Wrongful Acts</u> actually or allegedly result in the deterioration in the value of any debt instrument or security as a result of, wholly or in part the bankruptcy or insolvency of the <u>Insured Organization</u>.

(<u>Id.</u> at 33)

The Policy also contains the following "allocation clause":

If both <u>Loss</u> covered under this policy and loss not covered under this policy are jointly incurred either because a <u>Claim</u> includes both covered and non-covered matters or covered and non-covered causes of action or because a <u>Claim</u> is made against both an <u>Insured</u> and any other parties not insured by this policy, then the <u>Insured</u> and the <u>Insurer</u> shall use their best efforts to fairly and reasonably allocate payment under this policy between covered <u>Loss</u> and non-covered loss based on the relative legal exposures of the parties with respect to covered and non-covered matters or covered and non-covered causes of action.

If the <u>Insurer</u> and the <u>Insured</u> agree on an allocation of <u>Defense Expenses</u>, based on covered and non-covered matters or persons, the <u>Insurer</u> shall advance <u>Defense Expenses</u> allocated to covered <u>Loss</u>.  If there is no agreement on an allocation of

<u>Defense Expenses</u>, the <u>Insurer</u> shall advance <u>Defense Expenses</u> that the <u>Insurer</u> believes to be covered under this policy until a different allocation is negotiated, arbitrated, or judicially determined.

(<u>Id.</u> at 16)

### C.    <u>The Rauch Action</u>

On May 22, 2019, former Oaktree chief financial officer and chief operating officer Donna Rauch sued Oaktree, McCollum, and then-Oaktree chief financial officer David Webb in North Carolina state court (the "Rauch Action").   (Rauch Action Cmplt. (Dkt. No. 79-19))  Rauch had previously asserted employment claims against Oaktree, which had been settled. She was also the lead relator in a <u>qui</u> <u>tam</u> False Claims Act case brought against Oaktree and McCollum.[5]  (<u>Id.</u> ¶¶ 8-10)  The Rauch Action alleged claims for breach of contract in connection with the prior settlement agreement, fraud, slander, tortious interference, malicious prosecution, and abuse of process, all relating to Oaktree filing a report about Rauch with the county sheriff. (<u>Id.</u> ¶¶ 25-67)  In a June 6, 2019 letter, Landmark agreed to defend Oaktree and its officers in the Rauch Action.   (June 6, 2019 Landmark Ltr. (Dkt. No. 79-20))  Daileader states that the Rauch Action is currently stayed pending Oaktree's bankruptcy proceedings.  (Pltf. Supp. Br. (Dkt. No. 77) at 16)

### D.    <u>Oaktree's Bankruptcy Filings</u>

On September 19, 2019, all three Oaktree entities filed Chapter 7 bankruptcy petitions in the U.S. Bankruptcy Court for the Western District of North Carolina.  The cases were subsequently transferred to the U.S. Bankruptcy Court for the District of South Carolina

---

[5]  McCollum pleaded guilty to violating the False Claims Act and entered into a $9 million civil consent judgment.  <u>See</u> Dept. of Justice, South Carolina Chiropractor Pleads Guilty and Agrees to $9 Million False Claims Act Consent Judgment (Nov. 22, 2021), <u>available at</u> https://www.justice.gov/opa/pr/south-carolina-chiropractor-pleads-guilty-and-agrees-9-million-false-claims-act-consent.

and remain pending there.  See In re Labsource, LLC, Case No. 19-05161-hb (Bankr. D.S.C.); In re Oaktree Medical Centre, LLC, Case No. 19-05154-hb (Bankr. D.S.C.); In re Oaktree Medical Centre, PC, Case No. 19-05155-hb (Bankr. D.S.C.).

        E.        **The Trustee's Letters and the Insurers' Responses**

In an April 1, 2021 letter to Daileader, John Fort – the Bankruptcy Trustee for the Oaktree estates – asserts that Daileader and a consulting firm he had engaged while at Oaktree are "jointly and severally liable to the Estates for their failure to comply with South Carolina law by breaching their fiduciary duties while engaged as officers and directors of the Debtors."  (Apr. 1, 2021 Trustee Ltr. (Dkt. No. 43-8) at 5)  Daileader forwarded the letter to Oaktree's insurance broker, who in turn forwarded the letter to the Insurers.  (Id. at 2)

In an April 30, 2021 letter, Landmark agreed to defend Daileader against the Trustee's claims, but reserved its rights as to indemnification.  (Apr. 30, 2021 Landmark Ltr. (Dkt. No. 43-19) at 2)

In a June 28, 2021 letter to Oaktree's insurance broker, the Trustee demanded that the Excess Insurers tender their policy limits by July 14, 2021.  (June 28, 2021 Trustee Ltr. (Dkt. No. 43-10))  That same month, the Trustee sent Daileader a copy of a draft adversary complaint to be filed against Daileader and others whom Daileader had brought in to work at Oaktree. (Mascia Decl. (Dkt. No. 43) ¶ 11; Draft Adversary Cmplt. (Dkt. No. 43-9)).

In an August 2, 2021 letter to Oaktree's insurance broker, Syndicate 1861 – through its agent, ANV Global Services, Inc. – states that it is denying coverage to Daileader because the Trustee's claims against him fall within the Bankruptcy/Insolvency Exclusion of the Policy.  (Aug. 2, 2021 Denial Ltr. (Dkt. No. 43-23))  The other Excess Insurers have also denied coverage under this exclusion.  (FAC (Dkt. No. 15) ¶ 45)

F.      **The Adversary Complaints Against Daileader**

On September 17, 2021, the Trustee filed three "analogous adversary proceeding complaints" against Daileader and others in the Oaktree bankruptcy proceedings.  (FAC (Dkt. No. 15) ¶ 46)[6]  On December 7, 2021, he filed amended adversary complaints.  See, e.g., Fort v. Daileader, Adv. Proc. 21-80057-hb, Am. Cmplt. (Dkt. No. 33) (Bankr. D.S.C.).

The amended adversary complaints allege that Daileader "made no attempt to coordinate a sale or refinance of [Oaktree] and did not even begin a corporate restructuring." The complaints also assert that once it was clear that Oaktree would have to file for bankruptcy, Daileader failed to steer Oaktree into a Chapter 11 reorganization, rather than a Chapter 7 liquidation.  Fort v. Daileader, Adv. Proc. 21-80057-hb, Am. Cmplt. (Dkt. No. 33) at 2 (Bankr. D.S.C.); see also id. ¶¶ 40, 93-94, 102-03, 149, 159.  The complaints further allege that Daileader wrongfully caused Oaktree to incur millions of dollars in unnecessary professional fees and that, "[o]n Mr. Daileader['s] watch, [Oaktree's] total assets fell from approximately $11.8 million on July 1, 2018 to approximately $6.8 million on August 1, 2019.  Total liabilities increased from approximately $27 million to approximately $39 million during the same period."  Id. at 2, ¶¶ 73, 76, 104 & n.13, 113, 147, 169, 209 (Bankr. D.S.C.).

The amended adversary complaints assert causes of action against Daileader for breach of fiduciary duty, negligence, fraud, civil conspiracy, unjust enrichment, fraudulent transfers in violation of 11 U.S.C. § 548(a)(1)(A), constructive fraudulent transfers in violation of 11 U.S.C. § 548(a)(1)(B), preference liability under 11 U.S.C. § 547, recovery of avoided transfers under 11 U.S.C. § 550, and breach of contract.  See id., passim.

---

[6] The three adversary proceedings are Adv. Proc. Nos. 21-80057-hb, 21-80058-hb, and 21-80059-hb (Bankr. D.S.C.).

G.    **Subsequent Events Involving the Adversary Proceedings**

After the Trustee filed the adversary complaints, Syndicate 1861 – through its

agent ANV – sent an October 27, 2021 letter to Oaktree's insurance broker stating that it

"maintain[ed] its position that coverage is precluded for Daileader . . . by virtue of the Primary

Policy's Bankruptcy/Insolvency Exclusion."  (Oct. 27, 2021 Denial Ltr. (Dkt. No. 43-22) at 3)

In a July 8, 2022 letter to Oaktree's broker – with a copy to the Excess Insurers –

Landmark states "that it ha[s] exhausted the $1,000,000 limit of the Landmark Policy and that it

[has] therefore stopped defending Daileader."  (Dunn Decl. (Dkt. No. 44) ¶ 19; see July 8, 2022

Landmark Ltr. (Dkt. No. 44-3))

Syndicate 1861 has not paid for Daileader's defense since the Landmark Policy

coverage was exhausted.  According to David Dunn, Daileader's defense lawyer in the adversary

proceedings,

> Mr. Daileader's unpaid defense costs in the [a]dversary [p]roceedings exceed
> $200,000 and are mounting. . . . [I]f Syndicate 1861 is not ordered to defend Mr.
> Daileader, his defense of the [a]dversary [p]roceedings will be, and indeed it
> already has been, materially impaired; he will be irrevocably prejudiced and
> irreparably harmed by the lack of resources to mount a vigorous and timely
> defense. . . . Syndicate 1861's refusal to honor its obligation to pay defense costs
> has already harmed Mr. Daileader by preventing . . . his counsel from conducting
> . . . important depositions, and has impaired [them] from conducting a thorough
> and effective review of thousands of pages of materials being produced through
> discovery. . . . [Daileader also] faces a risk of enormous civil liability.  The
> Trustee has stated that he seeks at least $38 million and potentially over $925
> million in alleged damages.  Mr. Daileader also faces serious reputational harm
> based on the nature and extent of the Trustee's allegations against him, which
> wrongfully attack his ethics and professional credibility.

(Dunn Decl. (Dkt. No. 44) ¶¶ 8, 12, 15)

II.    **PROCEDURAL HISTORY**

The parties' disputes have spawned two actions in this District.  On February 1,

2022, the Excess Insurers brought a declaratory judgment action in New York state court against

Daileader under the New York C.P.L.R., which Daileader removed to this Court on March 11, 2022.  In a January 13, 2023 order, this Court remanded that case to New York state court.  See Certain Underwriters at Lloyd's London - Syndicate 1861 v. Daileader, No. 22 CIV. 2038 (PGG), 2023 WL 185518 (S.D.N.Y. Jan. 13, 2023).

On March 18, 2022, Daileader filed the Complaint in the instant action in the U.S. District Court for the District of South Carolina.  (Dkt. No. 1)

On June 7, 2022, Daileader moved in the District of South Carolina for a preliminary injunction directing Defendant Syndicate 1861 to defend him in the adversary proceedings and to pay his legal expenses as they are incurred.  (Dkt. No. 18)

In a June 23, 2022 order, the U.S. District Court for the District of South Carolina transferred the instant action to this District, where the first-filed action was then pending.  See Daileader v. Certain Underwriters at Lloyd's London - Syndicate 1861, No. CV 7:22-916-HMH, 2022 WL 2276461 (D.S.C. June 23, 2022).

On August 2, 2022, this Court ordered Daileader to amend his pending motion for a preliminary injunction to address Second Circuit authority.  (Dkt. No. 37)

On August 17, 2022, Daileader filed his amended motion for a preliminary injunction, which seeks an order directing Syndicate 1861 to defend him in the adversary proceedings and to pay his legal expenses as they are incurred.  (Dkt. No. 41)  Syndicate 1861 filed its opposition on August 31, 2022; Daileader filed a reply on September 7, 2022; Daileader filed a supplemental declaration on October 31, 2022; Syndicate 1861 filed a response in opposition to the supplemental declaration on November 4, 2022; and Daileader filed a reply in support of his supplemental declaration on November 21, 2022.  (Dkt. Nos. 45-46, 52-53, 59) On February 3, 2023, in response to a directive from this Court, the parties made submissions

indicating that the premiums for the Syndicate 1861 policy at issue here, and for the endorsement extending the coverage period under that policy, had been paid.  (Dkt. Nos. 70-71)

On January 18, 2023, the Insurers filed a letter requesting a pre-motion conference regarding an anticipated motion to dismiss for lack of subject matter jurisdiction. (Dkt. No. 62)

On January 19, 2023, the Court held a status conference in this case.  (Jan. 19, 2023 Tr. (Dkt. No. 67))

Following the January 19, 2023 conference, the Court ordered the parties to submit letters stating "(1) whether there is an agreement among the parties as to potential amendment by Plaintiff to allege diversity jurisdiction; and (2) relatedly, whether the parties anticipate further motion practice on subject-matter jurisdiction, and if so, on what grounds."  In addition, the Court ordered Daileader to address whether he intended to file a motion to re-transfer, following the remand of the first-filed action.  (Dkt. Nos. 63-64)

In a January 26, 2023 joint letter, the parties state that they do not believe that diversity jurisdiction exists – given the numerous subscribers of the Lloyd's syndicates.  The parties go on to state, however, that they agree that either federal question jurisdiction or bankruptcy jurisdiction exists.  Daileader also states that he will not move to re-transfer this action.  As to the action the Court remanded, the parties say that the insurers voluntarily dismissed that action following the remand.  (Dkt. No. 65)

On February 8, 2023, this Court conducted a hearing concerning Plaintiff's application for a preliminary injunction.  (Feb. 8, 2023 Tr. (Dkt. No. 75))

The parties filed post-hearing submissions on February 15, 2023.  (Dkt. Nos. 77-79)

## DISCUSSION

### I.   JURISDICTION

Although neither side contests subject matter jurisdiction (see Jan. 26, 2023 Joint Ltr. (Dkt. No. 65) at 1-2), "[a] federal court has an independent duty to ensure that it has subject matter jurisdiction." Ent. One US LP v. Robinson, No. 18-CV-07147 (AJN), 2019 WL 4640060, at *2 (S.D.N.Y. Sept. 24, 2019) (citing Gonzalez v. Thaler, 565 U.S. 134, 141 (2012)).  The FAC asserts federal question jurisdiction, bankruptcy jurisdiction, and supplemental jurisdiction under 28 U.S.C §§ 1331, 1334, and 1367, respectively.  (FAC (Dkt. No. 15) ¶ 13)

Title 28, United States Code, § 1334 provides, in relevant part, that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(b).

"'[A] civil proceeding is related to a title 11 case if the action's outcome might have any conceivable effect on the bankrupt estate.'"  SPV Osus Ltd. v. UBS AG, 882 F.3d 333, 339-40 (2d Cir. 2018) (quoting Parmalat Capital Fin. Ltd. v. Bank of Am. Corp., 639 F.3d 572, 579 (2d Cir. 2011)).  This broad standard encompasses disputes involving the proceeds of a debtor's D&O policy.  See, e.g., Canosa v. Ziff, No. 18 CIV. 4115 (PAE), 2018 WL 3642631, at *6 (S.D.N.Y. Aug. 1, 2018) ("The directors' claims on the proceeds of [debtor]'s D&O insurance policy have the 'possibility of an effect on the estate' of [the debtor].  Given the uncertain facts of the D&O insurance policy at issue here, as well as the unsettled legal standard that may govern this question in this Circuit, the directors have a 'reasonable legal basis for [their] claim' to draw upon the insurance policy, which is sufficient to invoke this Court's related-to jurisdiction.") (quoting SPV Osus, 882 F.3d at 340); Am. Int'l Specialty Lines Ins. Co. v. Towers Fin. Corp., 198 B.R. 55, 62 (S.D.N.Y. 1996) ("[A] proceeding to determine

the plaintiff insurers' rights and obligations under the Policies could conceivably have an effect on [debtor's] bankruptcy estate.").  Because the instant dispute is "related to" Oaktree's bankruptcy, this Court has subject matter jurisdiction.

In this Court's recent order remanding the first-filed action, Daileader and Excess Insurers agreed that the case was "related to" Oaktree's bankruptcy, but this Court nevertheless held that mandatory abstention applied under 28 U.S.C § 1334(c)(2).  See Certain Underwriters at Lloyd's London - Syndicate 1861 v. Daileader, No. 22 CIV. 2038 (PGG), 2023 WL 185518, at *10–15 (S.D.N.Y. Jan. 13, 2023).  That holding does not apply in the instant case for two reasons.

First, in the related action, the federal issue – whether the Bankruptcy/Insolvency Exclusion was an ipso facto clause – was only an anticipated defense, and thus did not appear on the face of the Excess Insurers' well-pleaded complaint.  See id. at *9 n.5 ("Because the Amended Complaint does not satisfy the well-pleaded complaint rule, this Court has concluded that it lacks jurisdiction under 28 U.S.C. §§ 1334 and 1452, the bankruptcy jurisdiction and removal statutes.").  By contrast, in the instant case, the FAC seeks a declaration that the exclusion is an ipso facto clause, which satisfies the well-pleaded complaint rule.  See Iberiabank v. Beneva 41-1, LLC, 701 F.3d 916, 919 n.4 (11th Cir. 2012) (holding that a complaint seeking a declaratory judgment that a contract provision is an unlawful ipso facto clause satisfies the well-pleaded complaint rule, while a complaint filed by the adversary seeking to enforce the same contractual provision – and raising the ipso facto clause issue preemptively merely to show that it is inapplicable – would not satisfy the well-pleaded complaint rule).

Second, a court can find that abstention is mandatory only "[u]pon timely motion of a party," 28 U.S.C § 1334(c)(2); see Whitney Lane Holdings, LLC v. Don Realty, LLC, No.

08-CV-775 (GKS.RFT), 2010 WL 1257879, at *4 (N.D.N.Y. Mar. 26, 2010); In re JCC Cap.

Corp., 147 B.R. 349, 354 n.1 (Bankr. S.D.N.Y. 1992), and here no party has challenged this

Court's jurisdiction.

      In sum, this Court has "related to" bankruptcy jurisdiction over the parties'

dispute and will not abstain from hearing it.

## II.    LEGAL STANDARDS

###     A.    Preliminary Injunction

      "A party seeking a preliminary injunction must show (1) irreparable harm; (2)

either a likelihood of success on the merits or both serious questions on the merits and a balance

of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the

public interest." N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc., 883 F.3d 32,

37 (2d Cir. 2018).

      Where "the movant is seeking to modify the status quo by virtue of a

'mandatory preliminary injunction' (as opposed to seeking a 'prohibitory preliminary injunction'

to maintain the status quo), or where the injunction being sought 'will provide the movant with

substantially all the relief sought and that relief cannot be undone even if the defendant prevails

at a trial on the merits,'" a higher standard applies. Aviles v. de Blasio, No. 20 CIV. 9829

(PGG), 2021 WL 796033, at *17 (S.D.N.Y. Mar. 2, 2021) (quoting Yang v. Kosinski, 960 F.3d

119, 127-28 (2d Cir. 2020) (emphases in Yang)), vacated as moot sub nom. Lisa v. de Blasio,

No. 21-721, 2022 WL 1216298 (2d Cir. Apr. 21, 2022).  In mandatory injunction cases, "'the

movant must also: (1) make a strong showing of irreparable harm, and (2) demonstrate a clear or

substantial likelihood of success on the merits.'" Id. (quoting Yang, 960 F.3d at 127-28))

(further quotations omitted).

**B.    Interpretation of Insurance Policies[7]**

"Under New York law, '[i]t is well established that' courts 'determining a dispute over insurance coverage [must] first look to the language of the policy.'" Danaher Corp. v. Travelers Indem. Co., 414 F. Supp. 3d 436, 448–49 (S.D.N.Y. 2019) (quoting Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 21 N.Y.3d 139, 148 (2013); and Consol. Edison Co. of N.Y. v. Allstate Ins. Co., 98 N.Y.2d 208, 221 (2002)) (brackets in Danaher). "The language of the policy is then to be 'interpreted according to general rules of contract interpretation.'  Doing so mandates that 'the language of the contracts . . . be interpreted according to common speech and consistent with the reasonable expectation of the average insured.'" Id. (quoting Olin Corp. v. Am. Home Assurance Co., 704 F.3d 89, 98 (2d Cir. 2012); and In re Viking Pump, Inc., 27 N.Y.3d 244, 257 (2016)).  "Ambiguities in contract language must be construed in favor of the insured, [b]ut 'a contract is not ambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.' . . . .  'If a contract is unambiguous, courts are required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning.'" Id. (quoting Viking Pump, 27 N.Y.3d at 258; and Liberty Mut. Ins. Co. v. Fairbanks Co., 170 F. Supp. 3d 634, 642-43 (S.D.N.Y. 2016)) (brackets in Danaher).

"'In New York, an insurer's duty to defend is "exceedingly broad" and distinct from the duty to indemnify.'" Admiral Ins. Co. v. Niagara Transformer Corp., 57 F.4th 85, 93

---

[7]  The Syndicate 1861 Policy provides that "[a]ll matters arising hereunder including questions related to the validity, interpretation, performance, and enforcement of this Policy shall be determined in accordance with the law and practice of the State of New York notwithstanding New York's conflicts of law rules."  (Syndicate 1861 Policy (Dkt. No. 43-2) at 13)  Both parties have cited New York law.  Accordingly, this Court will apply New York law.

n.2 (2d Cir. 2023) (quoting Euchner-USA, Inc. v. Hartford Cas. Ins. Co., 754 F.3d 136, 140 (2d

Cir. 2014)) (in turn quoting Auto. Ins. Co. of Hartford v. Cook, 7 N.Y.3d 131, 137 (2006)).  "The

duty to defend arises whenever the underlying complaint alleges facts that fall within the scope

of coverage . . . .  [and] [t]he ultimate validity of the underlying complaint's allegations is

irrelevant."  Fed. Ins. Co. v. Kozlowski, 18 A.D.3d 33, 40-41 (1st Dept. 2005); see Seaboard Sur.

Co. v. Gillette Co., 64 N.Y.2d 304, 310 (1984) ("[T]he duty of the insurer to defend the insured

rests solely on whether the complaint alleges any facts or grounds which bring the action within

the protection purchased.").

      "[W]henever an insurer wishes to exclude certain coverage from its policy

obligations, it must do so in clear and unmistakable language.  Any such exclusions or

exceptions from policy coverage must be specific and clear in order to be enforced.  They

are not to be extended by interpretation or implication, but are to be accorded a strict and

narrow construction.  Indeed, before an insurance company is permitted to avoid policy

coverage, it must satisfy the burden which it bears of establishing that the exclusions or

exemptions apply in the particular case, and that they are subject to no other reasonable

interpretation."  Seaboard, 64 N.Y.2d at 311 (quotations omitted).

    **C.**    ***In re WorldCom, Inc. Securities Litigation***

      Daileader relies heavily on In re WorldCom, Inc. Securities Litigation, 354 F.

Supp. 2d 455 (S.D.N.Y. 2005).  Accordingly, this Court addresses that decision in detail below.

      The WorldCom litigation was precipitated by the revelation of a massive

accounting fraud at the company.  The subsequent bankruptcy was then the largest in U.S.

history.  See Simon Romero, WorldCom's Collapse:  The Overview; WorldCom Files for

Bankruptcy; Largest U.S. Case, N.Y. Times (July 22, 2002) ("WorldCom, plagued by the rapid

erosion of its profits and an accounting scandal that created billions in illusory earnings, last

night submitted the largest bankruptcy filing in United States History."), <u>available at</u>

https://www.nytimes.com/2002/07/22/us/worldcom-s-collapse-the-overview-worldcom-files-for-

bankruptcy-largest-us-case.html?smid=url-share.

  After many class actions were filed, they were consolidated in a multi-district

litigation in this District.  <u>WorldCom</u>, 354 F. Supp. 2d at 458.  The cases ultimately settled in

2005 for approximately $6 billion, after three years of litigation and a multi-week trial.  <u>See</u>

<u>WorldCom</u> Settlement Order, No. 02 CIV.3288(DLC), 2005 WL 2293150 (S.D.N.Y. Sept. 21,

2005); <u>WorldCom:  Even the Dead Settle</u>, Forbes (Apr. 26, 2005), <u>available at</u>

https://www.forbes.com/2005/04/26/cx_da_0426topnews.html?sh=72e32a26132e.

  Continental Casualty Company and other excess D&O liability insurers rescinded

their policies, asserting that WorldCom had made material misstatements to the excess insurers

about the risk of securities fraud claims when applying for the excess policies, thus rendering

those policies void.  Bert C. Roberts, Jr. – the former chairman of WorldCom's board of

directors – moved for a preliminary injunction "compelling Continental Casualty Company . . .

to honor an excess [D&O] liability policy that it issued and to advance immediately the costs of

defending Roberts against claims filed in a host of lawsuits" while the excess insurers' rescission

claim was litigated.  <u>WorldCom</u>, 354 F. Supp. 2d at 458-60.  The <u>WorldCom</u> court granted the

preliminary injunction 25 days before trial was set to begin.  <u>Id.</u> at 469.

  <u>WorldCom</u> was one of the largest and most complex litigations in history.  The

movant for the preliminary injunction in that case had been the chairman of the board of a

company that had participated in one of the largest accounting frauds ever seen.  At the time the

court considered his application, he was facing trial in 25 days, having already litigated the case

for several years.

19

Without minimizing the importance of the Oaktree bankruptcy or how difficult Daileader's experience as a litigant in the adversary proceedings might be, the circumstances here are not comparable to those in <u>WorldCom</u>.  Daileader is not facing a trial in 25 days, and he is not at the center of the largest accounting fraud in U.S. history.

<u>WorldCom</u> also presented a public policy concern not at issue here.  Roberts' role as an independent director was central to the <u>WorldCom</u> court's analysis in granting a preliminary injunction:

> D&O insurance is not only designed to provide financial security for the individual insureds, but also plays an important role in corporate governance in America.  Unless directors can rely on the protections given by D&O policies, good and competent men and women will be reluctant to serve on corporate boards.  As the Third Circuit has observed, a primary purpose of Delaware indemnification provisions is "to encourage capable men to serve as corporate directors, secure in the knowledge that expenses incurred by them in upholding their honesty and integrity as directors will be borne by the corporation they serve."

<u>WorldCom</u>, 354 F. Supp. 2d at 469 (quoting <u>Witco Corp. v. Beekhuis</u>, 38 F.3d 682, 691 (3d Cir.1994)).

Here – although Daileader's title at one of the Oaktree entities was "Independent Director" – his actual role at the Oaktree entities was the day-to-day management and operation of the companies.  As discussed above, he was brought into Oaktree through Drivetrain, LLC, a consulting firm that typically serves financially distressed companies.  Drivetrain:  What We Do, <u>available at</u> https://www.drivetrainllc.com/what-we-do.  The amended adversary complaints – the allegations of which determine whether there is a duty to defend – assert that Daileader was "vested . . . with corporate authority and control over all day-to-day management, financials, and operations of [Oaktree]."  <u>Fort v. Daileader</u>, Adv. Proc. 21-80057-hb, Am. Cmplt. (Dkt. No. 33) ¶ 22 (Bankr. D.S.C.).

The corporate documents concerning Daileader's appointment confirm that he had effective control over all the actions and decisions of the Oaktree entities during his tenure. (See Unanimous Written Consent of the Sole Stockholder of Oaktree Medical Centre, P.C. (Dkt. No. 79-2) at 3 ("Tim Daileader . . . is appointed as sole member of the Board . . . . [Daileader], as sole member of the Board, is authorized and empowered to do and perform such . . . acts and things . . . as necessary or advisable."); LabSource, LLC Operating Agreement (Dkt. No. 79-10) at 11-13 (describing the "full and complete authority, power, and discretion [of the manager] to manage and control the business, affairs, and properties of the Company"); Oaktree Medical Centre, LLC Operating Agreement (Dkt. No. 79-11) at 4 ("The Manager shall have full and complete authority, power, and [discretion] to manage and control the business of the Company.")) In short, while Daileader claims that he "served the typical role of the director of a company – that is, he supervised the business of Oaktree – which was managed, day to day, by the officers" (Pltf. Supp. Br. (Dkt. No. 77) at 7), this assertion contradicts both the allegations in the amended adversary complaints and the record before this Court.[8]

Daileader was serving in an operational role, and not in a corporate governance role. The position he occupied at Oaktree is in no way comparable to Roberts' role as chairman of the board of WorldCom. Accordingly, the corporate governance concerns that animate WorldCom (see WorldCom, 354 F. Supp. 2d at 469) are not present here.

---

[8] Contrary to Daileader's claim, it is obvious that Oaktree was not "managed, day to day, by the officers" (Pltf. Supp. Br. (Dkt. No. 77) at 7), because Daileader fired the CEO and CFO of Oaktree soon after taking control. As of ten months later, he had done nothing to replace them. See Fort v. Daileader, Adv. Proc. 21-80057-hb, Am. Cmplt., Ex. A (Dkt. No. 33-2) at 2 (Bankr. D.S.C.) (May 16, 2019 Daileader letter to the U.S. Department of Justice stating that (1) "[s]oon after becoming an independent director of [Oaktree] . . . . [Daileader] terminate[d] for cause both the former Chief Executive Officer [of Oaktree] and the former Chief Financial Officer [of Oaktree]"; and (2) ten months later, he was still "working to retain a professional search firm for the purpose of locating long term senior management for [Oaktree]").

III.    **ANALYSIS**

    A.    **Whether the Injunction Plaintiff Seeks is Mandatory or Prohibitory**

        The general rule is that an injunction that requires a party to make a payment or otherwise take an affirmative action to perform under a contract is mandatory in nature.  See, e.g., Paxi, LLC v. Shiseido Americas Corp., 636 F. Supp. 2d 275, 281 (S.D.N.Y. 2009) (plaintiff retailer argued that defendant supplier had breached a contract by refusing to supply plaintiff retailer's new store; the court held that an injunction requiring defendant supplier to supply the new store was mandatory.); Katzenberg v. First Fortis Life Ins. Co., 500 F. Supp. 2d 177, 189-90 (E.D.N.Y. 2007) ("[P]laintiff seeks . . . a mandatory injunction directing defendant to pay him all benefits due under the Policy 'both retroactively and prospectively.'"); Sammarco v. Bd. of Trustees, Loc. 812 Health Fund, No. 03 CIV. 433 (FM), 2004 WL 1488210, at *4 (S.D.N.Y. July 1, 2004) ("[Plaintiff] also seeks a mandatory injunction requiring the Trustees to pay any past and future medical bills arising out of the Accident."); Kutas v. Regan, 712 F. Supp. 445, 447 (S.D.N.Y. 1989) ("The relief sought in the complaint is . . . a mandatory injunction directing defendant to pay plaintiff a pension retroactive to his retirement.").

        Consistent with this general rule, courts in this Circuit have found that where a party seeks an order requiring an insurer to advance defense costs when it has not previously done so, that party is seeking a mandatory injunction.  See Connecticut Mun. Elec. Energy Coop. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, No. 3:19CV00839(SALM), 2022 WL 3716445, at *4 (D. Conn. Aug. 29, 2022) ("The Court is inclined to view plaintiff's request as invoking mandatory relief."); Pereira v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., No. 04 CIV. 1134 (LTS), 2006 WL 1982789, at *11 n.17 (S.D.N.Y. July 12, 2006) ("Defendants indicate that they have not advanced any defense costs to the Intervenors. To the extent then that the Intervenors seek such costs, their request for injunctive relief would amount to a mandatory injunction rather

than the requested prohibitory injunction seeking to keep the status quo."); see also In re

Adelphia Commc'ns Corp., 323 B.R. 345, 373-74 (Bankr. S.D.N.Y. 2005) (injunction requiring

employer to advance directors' and officers' defense costs was mandatory "because of the

certain or near-certain inability of the [directors and officers] to repay the money that they are

requesting – which would make a meaningful remedy to [the employer] impossible, if [the

employer] were to prevail"); Hanover Ins. Co. v. Vemma Int'l Holdings Inc., No. CV-16-01071-

PHX-JJT, 2016 WL 4059606, at *5 (D. Ariz. July 29, 2016) (construing insureds' motion for a

preliminary injunction requiring D&O insurer to pay defense costs as seeking a mandatory

injunction).

        Here, Syndicate 1861 has never paid defense costs to Daileader and has

consistently denied coverage, even before the adversary proceedings were filed.  (See Aug. 2,

2021 Denial Ltr. (Dkt. No. 43-23) (pre-adversary complaints); Oct. 27, 2021 Denial Ltr. (Dkt.

No. 43-22) (post-adversary complaints))  The status quo is thus one of non-payment by

Syndicate 1861.  Daileader moves for an order requiring Syndicate 1861 to take an affirmative

step that would change this status quo.  He thus seeks a mandatory injunction.

        Citing WorldCom and Li v. Certain Underwriters at Lloyd's, London, 183 F.

Supp. 3d 348 (E.D.N.Y. 2016) – a decision that follows WorldCom – Daileader argues that he is

seeking a prohibitory injunction, because "'the policy language strongly supports [the

policyholder's] argument that [the insurance company] should already have been advancing

defense costs.'"  (Pltf. Br. (Dkt. No. 42) at 22 (quoting WorldCom, 354 F. Supp. 2d at 463)

(alterations in Plaintiff's Brief); see Pltf. Supp. Br. (Dkt. No. 77) at 10 ("[A]n injunction

enforcing an insurance company's duty to defend is not mandatory because such an injunction

only 'require[s] a party to do what it "should have done earlier."'") (quoting Li, 183 F. Supp. 3d

at 361 (in turn quoting <u>Johnson v. Kay</u>, 860 F.2d 529, 541 (2d Cir. 1988)) (alterations in Plaintiff's Supplemental Brief))

This logic is flawed, however, because whether Syndicate 1861 should have advanced defense costs to Daileader is a merits question, and not a factor in determining what standard applies for the issuance of a preliminary injunction. <u>WorldCom</u> and <u>Li</u> imply that where a movant has shown a likelihood of success on the duty to defend issue, an injunction requiring an insurer to pay defense costs is not mandatory, because the movant is merely seeking to require an act that should have already been performed. But none of this reasoning regarding the prohibitory or mandatory nature of a proposed preliminary injunction is part of the test set out by the Second Circuit for making that determination. The Second Circuit has instead instructed that a proposed preliminary injunction is mandatory where it seeks to alter the <u>status quo</u> or to provide the movant with substantially all the relief it seeks. <u>See Yang</u>, 960 F.3d at 127-28.

As support for the "what should have been done earlier" standard, <u>WorldCom</u> and <u>Li</u> cite <u>Johnson v. Kay</u>, 860 F.2d 529 (2d Cir. 1988). <u>Johnson</u> involved a power struggle between a newly elected reformist union president and old guard union officers. The old guard union officers had scheduled a referendum on a new union constitution that would limit the president's powers, and sent out mailers in support of the referendum. <u>Id.</u> at 532-34. The reformist president moved, among other things, for an order enjoining the referendum. <u>Id.</u> at 534-35. Applying the standard for issuance of a prohibitory injunction, the district court did not enjoin the referendum, but instead issued an injunction requiring the union to also send out mailers setting out the reformist president's position concerning the referendum. <u>Id.</u> at 540.

On appeal, the Second Circuit stated that – although requiring mailers was "mandatory in the sense that the order required the union to expend funds it perhaps otherwise would not have spent" – the district court had not abused its discretion in applying the lower standard for issuance of a preliminary injunction, because the district court had "only required the union to do what it should have done earlier – open channels of communication to dissenting views."  The district court had taken a "pragmatic approach to the peculiar and quite fluid situation" by ordering mandatory relief that was not "all the relief [plaintiff] sought" rather than "taking the extreme step of entering an injunction prohibiting the referendum itself."  Id. at 540-41.

Subsequent cases have noted that Johnson's holding turns on the narrow scope of the injunction in that case and the peculiar fact that a mandatory injunction was less onerous than a prohibitory injunction, which would have halted the referendum altogether.  See Tom Doherty Assocs., Inc. v. Saban Ent., Inc., 60 F.3d 27, 35 n.2 (2d Cir. 1995) (stating that the Johnson court "did not apply the heightened standard . . . because the relief was 'what [t]he union should have done earlier – open channels of communication to dissenting views,' and because the alternative was a more extreme prohibitory order enjoining a referendum"); Bricklayers Ins. & Welfare Fund v. LaSala, No. 12-CV-2314 (FB), 2018 WL 7053375, at *2 (E.D.N.Y. Nov. 15, 2018) (characterizing Johnson as "requir[ing] that defendants do even less than that which they 'should have done earlier'") (emphasis in original), report and recommendation adopted, No. 12CV2314FBRLM, 2019 WL 192884 (E.D.N.Y. Jan. 15, 2019).

Johnson does not apply here.  Insureds routinely seek injunctions requiring insurers to defend them.  Granting such a motion is not a bespoke, equitable solution like the injunction in Johnson.  Nor is it the case that mandating the payment of defense costs is less

intrusive than a prohibitory alternative, which is a unique feature of <u>Johnson</u>.  Accordingly, this Court rejects <u>WorldCom</u>'s and <u>Li</u>'s incorporation of <u>Johnson</u>'s "what should have been done earlier" standard, upon which Daileader relies.

In arguing that he does not seek a mandatory injunction, Daileader contends that he merely seeks to restore the <u>status quo</u> as of the "last uncontested status."  (Pltf. Supp. Br. (Dkt. No. 77) at 10)  The Second Circuit has held that the <u>status quo</u> for purposes of a mandatory injunction is not necessarily the <u>status quo</u> immediately preceding the motion for an injunction, but rather, the <u>status quo</u> as of the "'last actual, peaceable uncontested status which preceded the pending controversy,'" also referred to as the "<u>status quo ante</u>."  <u>N. Am. Soccer League</u>, 883 F.3d at 37 & n.5 (2d Cir. 2018) (quoting <u>Mastrio v. Sebelius</u>, 768 F.3d 116, 120 (2d Cir. 2014) (<u>per curiam</u>)).  For example, if Syndicate 1861 had been paying Daileader's defense costs and stopped making such payments, an injunction requiring it to resume payment would likely not be mandatory, because it would not be seeking to change the relevant <u>status quo</u>, but rather, to restore it.  <u>See XL Specialty Ins. Co. v. Level Glob. Invs., L.P.</u>, 874 F. Supp. 2d 263, 271-72 (S.D.N.Y. 2012).

Daileader argues that the last "peaceable" moment here was on August 1, 2021 – the day before Syndicate 1861's first denial letter – because at that point Landmark – the primary insurer that issued the followed policy – was paying Daileader's defense costs, and Syndicate 1861 had not yet denied coverage.  Daileader suggests that – although Syndicate 1861 has never paid his defense costs – it is bound by the primary insurer's decision to advance defense costs, and thus Daileader is trying to restore the <u>status quo</u>.  (Pltf. Supp. Br. (Dkt. No. 77) at 10-11 ("[As of] August 1, 2021[,] . . . . Syndicate 1861 had not denied coverage, and the primary insurance company, Landmark, was defending Daileader under the Landmark Primary Policy, <u>to</u>

which Syndicate 1861's policy follows form – that is, adopts the terms of the Landmark Primary Policy.  Daileader seeks to preserve <u>that</u> <u>status</u> <u>quo</u>.") (emphases in original))

This argument is not persuasive.  As an initial matter, August 1, 2021 predates the adversary complaints, and Daileader does not explain what defense costs, if any, Landmark advanced before the adversary complaints were filed.

Moreover – while New York courts have not spoken on this issue – the case law indicates that Syndicate 1861 was free to construe the policy language differently from Landmark, and therefore to make a different decision as to coverage.  See <u>Cristal USA Inc. v. XL Specialty Ins. Co.</u>, No. 2494 Sept.term,2014, 2017 WL 727795, at *20 (Md. Ct. Spec. App. Feb. 24, 2017) ("conclud[ing] that a follow form insurer is not automatically bound by the coverage determinations of the primary policy insurer"; stating that this holding is consistent with New York law); <u>Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London</u>, 449 Mass. 621, 633 (2007) ("An excess carrier's intent to incorporate the same words used in a separate agreement between the primary insurer and the insured does not imply an intent by the excess carrier to accept decisions made by the primary carrier about the extent of its obligations under its own agreement."); <u>see also</u> <u>Aspen Specialty Ins. Co. v. RLI Ins. Co.</u>, 194 A.D.3d 206, 213-15 (1st Dept. 2021) (holding that a court decision about a primary insurance policy did not compel an identical holding about language in a follow-form excess policy under either law-of-the-case principles or <u>res</u> <u>judicata</u>, because the two policies were separate contracts and the excess insurer had not been a party to the first litigation); <u>Nat'l Union Fire Ins. Co. of Louisiana v. Universal Fabricators, Inc.</u>, No. 05 CIV. 3418 SAS, 2007 WL 2059840, at *5 (S.D.N.Y. July 18, 2007) (holding that excess insurer was not bound by liability apportionment in settlement

negotiated by primary insurer).  In sum, Daileader could not have reasonably expected that Landmark's coverage decision would bind Syndicate 1861.

While Daileader asserts that Syndicate 1861's interpretation of its policy is wrong, and that accordingly Syndicate 1861 breached the policy and thus disrupted the last peaceable status quo, this Court cannot assume that Daileader's interpretation of the policy is correct.  See Tom Doherty Assocs., 60 F.3d at 34-35 (holding that injunction was mandatory when it "arguably alter[ed] the status quo by doing more than [was] required by the [a]greement"; and stating that "[c]onfusion in breach of contract cases as to whether an injunction is mandatory or prohibitory may stem from the meaning of 'status quo.'  A plaintiff's view of the status quo is the situation that would prevail if its version of the contract were performed.  A defendant's view of the status quo is its continued failure to perform as the plaintiff desires.").

For all these reasons, the Court holds that Daileader is seeking a mandatory preliminary injunction and must satisfy the higher standard.

**B.**     **Whether Daileader Has Shown Irreparable Harm**

Because financial harm alone is generally insufficient to establish irreparable harm, litigation costs do not constitute irreparable harm for purposes of a preliminary injunction. See Blanchard v. Tabulate, Inc., No. 18 CIV. 8631 (ER), 2018 WL 11383043, at *2 (S.D.N.Y. Oct. 22, 2018) ("'Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury.'") (quoting Renegotiation Bd. v. Bannercraft Clothing Co., 415 U.S. 1, 24 (1974)); Mongelli v. Chicago Ins. Co., No. 99 CV 8149 SJ, 2002 WL 32096578, at *1 (E.D.N.Y. Jan. 15, 2002) ("The Court finds that Plaintiff fails to demonstrate that he will suffer irreparable injury should a preliminary injunction not issue.  Plaintiff's alleged injury is purely financial – the cost of retaining different counsel at this stage of his ongoing litigation in the

28

[underlying] matter."); Top Choice Distributors, Inc. v. U.S. Postal Serv., No. 96-CV-0745E(H), 1996 WL 756907, at *2 (W.D.N.Y. Dec. 26, 1996) ("[I]f litigation costs could be considered irreparable harm, then any time a suit is brought, someone would have grounds for an injunction merely because of the cost of the litigation.") (quotation omitted).

   Moreover, a party seeking a preliminary injunction must make a specific, concrete showing of the harm it will suffer absent an injunction, and cannot rely on speculative claims of harm. See Tom Doherty Assocs., 60 F.3d at 37 ("Irreparable harm is an injury that is not remote or speculative but actual or imminent, and for which a monetary award cannot be adequate compensation.") (quotation omitted); Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 975 (2d Cir.1989) (same).

   Accordingly, where an insured seeks an injunction requiring an insurance company to defend the insured, the policy holder must make a specific showing of harm that will result from not receiving the defense coverage, and demonstrate that this harm cannot be remedied later through an award of compensatory damages. In particular, the movant must demonstrate that – absent the insurer providing a defense – the movant will either be unable to pay for a defense or suffer permanent financial harm, such as bankruptcy. See Pereira, 2006 WL 1982789, at *11 ("The Intervenors only allege monetary harm in that they may not receive all the insurance proceeds due to them. They do not even allege that they will be unable to mount their defense in the retrial without the insurance advances. Thus, the Intervenors have failed to demonstrate the requisite irreparable harm."); Emons Indus., Inc. v. Liberty Mut. Ins. Co., 749 F. Supp. 1289, 1294 (S.D.N.Y. 1990) (finding irreparable harm where an insured "ha[d] presented a convincing argument that it [would] be unable to finance the defense of the [underlying] cases for more than a short period of time . . . . [and that] the withholding of the Coverage Payments

[would] put [the insured] in a position of having to bankrupt itself shortly in order to defend itself"); Connecticut Mun. Elec. Energy Coop., 2022 WL 3716445, at *5 ("Absent some indication that failure to receive any remaining payments before a final judgment is entered will result in some harm beyond the mere delay in payment, [the insured] has failed to establish that its injury cannot be compensated by monetary damages.") (emphasis in original); Rochester Drug Co-Operative, Inc. v. Hiscox Ins. Co., No. 6:20-CV-06025 EAW, 2020 WL 906872, at *2 (W.D.N.Y. Feb. 25, 2020) (conducting a "thorough review of [p]laintiff's submissions" of financial data before finding that "[p]laintiff ha[d] met its burden of demonstrating irreparable harm if it [did] not receive an advancement of reasonable defense costs"); see also Cox v. Fletcher Allen Health Care, No. 2:05-CV-180, 2005 WL 2457632, at *2 (D. Vt. Oct. 5, 2005) (stating that "the party seeking an injunction must provide more than a bare assertion that the requested legal fees are necessary to an adequate defense"; finding that employee seeking an injunction requiring employer to pay defense costs had not shown irreparable harm) (citing Dover Steel Co. v. Hartford Acc. & Indem. Co., 806 F. Supp. 63, 65-66 (E.D. Pa. 1992) (holding that, to establish irreparable harm, insureds "should have [introduced] . . . financial statements, tax returns, general ledgers, or other documentary evidence of [their] financial health")).

Here, Daileader has made no such showing.  Daileader has instead submitted an affidavit from his lawyer in the adversary proceedings – David Dunn – stating that "Mr. Daileader's unpaid defense costs in the [a]dversary [p]roceedings exceed $200,000 and are mounting," and that "Syndicate 1861's refusal to honor its obligation to pay defense costs has already harmed Mr. Daileader by preventing . . . his counsel from conducting . . . important depositions, and has impaired [counsel] from conducting a thorough and effective review of thousands of pages of materials."  (Dunn. Decl. (Dkt. No. 44) ¶¶ 8, 12)  But Dunn does not

purport to have personal knowledge of Daileader's finances.  And Daileader himself has not submitted any affidavit or financial records asserting or demonstrating that he cannot pay Dunn.  There is thus no evidentiary basis on which this Court can find that Daileader is unable to pay his defense costs in the adversary proceedings as they are incurred.

And while Dunn asserts that "[t]he Trustee has stated that he seeks at least $38 million and potentially over $925 million in alleged damages" (Dunn Decl. (Dkt. No. 44) ¶ 15), the evidence in the record suggests that Daileader does not face ruinous liability.  Indeed, in a November 4, 2022 letter to the Court, Daileader states that "the Trustee entered into a settlement agreement with two of Mr. Daileader's co-defendants [in the adversary proceedings] – Huron Consulting Services . . . and its managing director, Aaron Kibbey . . . .  for an aggregate amount of $1.5 million in full satisfaction of the claims against them[,] . . . [which] include (but are not limited to) the same claims for which the Trustee alleged damages of at least $38 million and potentially more than $925 million jointly against Huron, Mr. Kibbey, and Mr. Daileader." (Nov. 4, 2022 Daileader Ltr. (Dkt. No. 54) at 3)  Daileader further asserts that – had the Excess Insurers been paying his defense costs – he "surely [would have] had an opportunity to join in settlement of the claims against him on favorable terms and within [the $10 million aggregate] policy limits." (Id.)  In short, Daileader's assertions suggest that the Trustee is willing to settle for far less than the figures Dunn sets out.

Citing WorldCom, however, Daileader contends that he need not demonstrate an inability to pay defense costs, because "as a matter of law, '[t]he failure to receive defense costs when they are incurred constitutes an immediate and direct injury' sufficient to satisfy the irreparable harm requirement."  (Pltf. Reply Br. (Dkt. No. 46) at 16 (quoting WorldCom, 354 F. Supp. 2d at 469) (brackets in Plaintiff's reply brief))

WorldCom's holding on this point is as follows:

The failure to receive defense costs when they are incurred constitutes an immediate and direct injury.  To hold otherwise would not provide insureds with protection from financial harm that insurance policies are presumed to give.

Roberts has shown irreparable injury.  The Securities Litigation is proceeding apace.  The class action trial begins on February 28, 2005, [25 days after the date of the preliminary injunction order].  Every party, including each director defendant, requires effective representation.  It is impossible to predict or quantify the impact on a litigant of a failure to have adequate representation at this critical stage of litigation.  The ability to mount a successful defense requires competent and diligent representation.  The impact of an adverse judgment will have ramifications beyond the money that will necessarily be involved.  There is the damage to reputation, the stress of litigation, and the risk of financial ruin – each of which is an intangible but very real burden.

D&O insurance is not only designed to provide financial security for the individual insureds, but also plays an important role in corporate governance in America.  Unless directors can rely on the protections given by D&O policies, good and competent men and women will be reluctant to serve on corporate boards.  As the Third Circuit has observed, a primary purpose of Delaware indemnification provisions is "to encourage capable men to serve as corporate directors, secure in the knowledge that expenses incurred by them in upholding their honesty and integrity as directors will be borne by the corporation they serve." Witco Corp. v. Beekhuis, 38 F.3d 682, 691 (3d Cir. 1994) (citation omitted).

Continental and Twin City argue that Roberts has failed show irreparable injury because he has not shown that he is unable to retain counsel from his own funds.  The issues here surmount whether an individual director has or does not have sufficient funds to pay counsel when confronted with litigation stemming from service as a corporate director.  In some cases, the litigation will be minor; here it is massive.  In some cases, a director will have great personal wealth; in other cases, she will not.  The issue here is whether every director protected by a policy equivalent to National Union's is entitled to ongoing payment of defense costs until there is a judicial determination that that right does not exist.  Under the terms of the National Union policy, and for the reasons set forth here, the answer is yes.

Id. at 469-70 (footnote and further quotations and citations omitted).

The considerations animating WorldCom's holding concerning irreparable harm are not present here, however.  No massive class action trial is imminent, nor does this case implicate the corporate governance concerns cited in WorldCom.  See WorldCom, 354 F. Supp.

2d at 469-70.  And while Daileader held the title of sole director of the Oaktree entities, he was in fact a professional manager hired to operate the Oaktree entities on a day-to-day basis.

To the extent that WorldCom suggests that an insured seeking a defense need not satisfy the traditional requirements for showing irreparable harm, this Court does not find the case's reasoning persuasive, at least absent the extraordinary circumstances prevailing in that case.  WorldCom holds that an insured seeking a defense necessarily establishes irreparable harm, because "[i]t is impossible to predict or quantify the impact on a litigant of a failure to have adequate representation at [a] critical stage of litigation. . . . The ability to mount a successful defense requires competent and diligent representation," [and] [t]he impact of an adverse judgment will have ramifications beyond the money that will necessarily be involved." Id. at 469.  But this reasoning assumes that the insured cannot pay his or her defense costs.  If the insured or another person or entity, such as the insured's employer, can and will pay the insured's defense costs, there will be no lapse in representation and no increased likelihood of an adverse judgment.  Accordingly, whether the insured has the resources to pay his or her defense costs is a critical aspect of the irreparable harm inquiry that cannot be ignored.

In holding that no inquiry regarding the ability to pay defense costs is appropriate, WorldCom allows an insured who would suffer no irreparable harm from an insurer's coverage denial to nevertheless obtain an injunction against the insurer.  But the blind application of such a rule could lead to absurd results in determining irreparable harm, as evidenced by the following exchange at the February 8, 2023 preliminary injunction hearing in this case.  The Court asked Daileader's counsel:  "[I]f Mr. Daileader [were] a billionaire who happened to have hundreds of lawyers on retainer, that would be entirely irrelevant to [the Court's] determination of whether he

has demonstrated irreparable harm?"  Daileader's counsel replied:  "It would be irrelevant."

(Feb. 8, 2023 Tr. (Dkt. No. 75) at 17)

WorldCom creates an exception to the irreparable harm requirement, specific to

duty-to-defend disputes in D&O insurance cases.  "The court [in WorldCom] apparently felt that

the societal interest in ensuring prompt payment of insurance claims was so important that an

insurer should be deemed to have caused irreparable harm simply by refusing to pay a claim,

even without a showing of financial need by the particular officer claiming advancement of

defense costs."  Cox, 2005 WL 2457632, at *3.  And because financial need is logically

necessary for establishing irreparable harm where an insurer chooses not to advance defense

costs, WorldCom effectively waives the requirement to show irreparable harm in that context.

But the Second Circuit has repeatedly stated for forty years or more that the

irreparable harm requirement is "the single most important prerequisite for the issuance of a

preliminary injunction."  Yang, 960 F.3d at 128 (quotation omitted); Faiveley Transp. Malmo

AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (same); Grand River Enter. Six Nations,

Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (same); Freedom Holdings, Inc. v. Spitzer, 408 F.3d

112, 114 (2d Cir. 2005) (same); Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002)

(same); Rodriguez ex rel. Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999) (same);

Jayaraj v. Scappini, 66 F.3d 36, 39 (2d Cir. 1995) (same); Borey v. Nat'l Union Fire Ins. Co. of

Pittsburgh, Pennsylvania, 934 F.2d 30, 34 (2d Cir. 1991) (same); Reuters Ltd. v. United Press

Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990) (same); Citibank, N.A. v. Citytrust, 756 F.2d 273,

275 (2d Cir. 1985) (same); Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp., 719 F.2d 42,

45 (2d Cir. 1983) (same).  This Court is not free to create an exception to such a well-established

rule that has been repeatedly confirmed by the Second Circuit.  If the standard for a preliminary

injunction is in fact lower in duty-to-defend cases involving D&O policies, that lower standard must be authorized by the Second Circuit.

Accordingly, this Court holds that – to demonstrate irreparable harm – an insured seeking a preliminary injunction requiring an insurer to pay defense costs must demonstrate an inability to pay defense costs absent payment from the insurer.

Daileader's remaining authority is likewise not persuasive.  Daileader cites Dupree v. Scottsdale Ins. Co. ("Dupree I"), 96 A.D.3d 546 (1st Dept. 2012) for the proposition that "'[t]he failure of an insurance company to advance payments covering defense costs and fees under a directors and officers liability policy, like the one at issue here, constitutes a direct, immediate, and irreparable injury, as it would deprive the insured of the benefit bargained for through payment of the policy premium.'"  (Pltf. Br. (Dkt. No. 42) at 36 (quoting Dupree I, 96 A.D.3d at 546))  Under Second Circuit law, however, a preliminary injunction may not issue merely because there is an assertion that the defendant breached a contract, particularly where the harm alleged is purely financial and could be remedied later through an award of money damages.  And while Dupree I relies on Wedtech Corp. v. Federal Ins. Co., 740 F. Supp. 214, 221 (S.D.N.Y.1990) (granting insured's motion for summary judgment), and Nu-Way Env't, Inc. v. Planet Ins. Co., No. 95 CIV 573(HB), 1997 WL 462010, at *3 (S.D.N.Y. Aug. 12, 1997) (same)), neither case arises in the context of a preliminary injunction motion, and neither discusses irreparable harm.  See Dupree I, 96 A.D.3d at 546.[9]

Li v. Certain Underwriters at Lloyd's, London, 183 F. Supp. 3d 348 (E.D.N.Y. 2016), and XL Specialty Ins. Co. v. Level Glob. Invs., L.P., 874 F. Supp. 2d 263 (S.D.N.Y.

---

[9] WorldCom cites these same cases, for the same proposition as in Dupree I.  See WorldCom, 354 F. Supp. 2d at 469.

2012) (cited in Pltf. Supp. Br. (Dkt. No. 77) at 18 n.5) are not persuasive because they rely on the reasoning of WorldCom.  See Li, 183 F. Supp. 3d at 361 (citing WorldCom's irreparable harm holding); XL Specialty Ins. Co., 874 F. Supp. 2d at 272 (same).  Similarly, In re Platinum-Beechwood Litig., 378 F. Supp. 3d 318 (S.D.N.Y. 2019) (cited in Pltf. Supp. Br. (Dkt. No. 77) at 18 n.5), and Freedom Specialty Ins. Co. v. Platinum Management (NY), LLC, No. 652505/2017, 2017 WL 6610417 (N.Y. Cnty. Sup. Ct. Dec. 27, 2017) (cited in Pltf. Br. (Dkt. No. 42) at 36), are not persuasive, because they rely on Dupree I.  See Platinum-Beechwood, 378 F. Supp. 3d at 329; Freedom Specialty, 2017 WL 6610417 at *3-4.  Platinum-Beechwood is also factually not on point, because in that case there "[was] powerful evidence in support of [the insured's] need for advancement" – namely, that the insured had appeared pro se in a related civil case. Platinum-Beechwood, 378 F. Supp. 3d at 329.

The Court also notes that Li, XL Specialty Insurance Company, Dupree I, Platinum-Beechwood, and Freedom Specialty all involve insureds facing criminal proceedings, a situation far more dire and susceptible to a finding of irreparable harm than the adversary proceedings against Daileader.

Finally, Great Am. Ins. Co. v. Gross, No. CIV.A. 305CV159, 2005 WL 1048752 (E.D. Va. May 3, 2005) (cited in Pltf. Br. (Dkt. No. 42) at 36) is likewise factually distinguishable because the court there found that "[t]he practical effect of [the insurers'] failure to advance costs of defense to [the insureds] would be to cause [the insureds' lawyers] to withdraw as [the insureds'] counsel, leaving them without representation." Id. at *4.  By contrast, Daileader has not argued – much less made a showing – that his lawyer in the adversary proceeding will withdraw if the Excess Insurers do not advance defense costs.

In sum, the Court concludes that Daileader has not shown irreparable harm.

**C.**   **Whether Daileader Has Clearly Shown a Likelihood of Success on the Merits**

The Court's holding as to irreparable harm is sufficient to find that Daileader is not entitled to a preliminary injunction under either the mandatory or prohibitory preliminary injunction standard.   See N. Am. Soccer League, 883 F.3d at 38 n.8 ("[The] [i]rreparable harm [requirement in prohibitory injunction cases] . . . is 'indistinguishable' from [the] extreme damage [requirement in mandatory injunction cases].") (quoting Jacobson & Co., Inc. v. Armstrong Cork Co., 548 F.2d 438, 441 n.3 (2d Cir. 1977)); Great Earth Int'l Franchising Corp. v. Milks Devs., Inc., 302 F. Supp. 2d 248, 252 (S.D.N.Y. 2004) (declining to decide whether plaintiffs were seeking a mandatory or prohibitory injunction where plaintiffs "ha[d] not made a sufficient present showing of irrevocable harm, a prerequisite for the issuance of a preliminary injunction of any sort").   The Court will nonetheless address whether Daileader has shown a likelihood of success on the merits.

Daileader argues that (1) that the Bankruptcy/Insolvency Exclusion does not apply to the adversary proceedings; and (2) even if the exclusion applies, it is an unlawful ipso facto clause.

**1.**   **Whether the Adversary Proceedings Fall within the Bankruptcy/Insolvency Exclusion**

**a.**   **Whether the Adversary Proceedings Constitute an Excluded Claim**

To reiterate, the Bankruptcy/Insolvency Exclusion reads as follows:

The Insurer shall not be liable to make any payment for Loss under this policy in connection with any Claim made against any Insured:

1. Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, any Wrongful Act that is alleged to have caused, directly or indirectly, in whole or in part:

   a. The bankruptcy or insolvency of the Insured Organization;

     b.  The <u>Insured Organization's</u> filing of a petition, or a petition being filed against the <u>Insured Organization</u> pursuant to the federal Bankruptcy Code or any similar state law;

     c.  The <u>Insured Organization</u> assigning its assets for the benefit of its creditors; or

     d.  By any other means seeking protection under the common or statutory law as a result of insolvency or financial impairment.

2.  Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, the <u>Insured Organization</u> having sustained a financial loss due to a <u>Wrongful Act</u> by or on behalf of any <u>Insured Person</u> that actually or allegedly occurred before the date that the <u>Insured Organization</u> or other party sought protection of the <u>Insured Organization</u>['s] assets by any means  . . . .

3.  Brought or maintained by or on behalf of any creditor or debt-holder of the <u>Insured Organization</u>, or any <u>Claim</u> arising out of any actual or alleged <u>Wrongful Act</u>, where such <u>Wrongful Act</u> actually or allegedly results in the <u>Insured Organization's</u> failure, refusal or inability to pay debts or amounts due and owing, including but not limited to <u>Claims</u> alleging misrepresentation in connection with any extension of credit or in connection with the purchase or sale of a debt instrument, or <u>Claims</u> alleging any <u>Wrongful Acts</u> where such <u>Wrongful Acts</u> actually or allegedly result in the deterioration in the value of any debt instrument or security as a result of, wholly or in part the bankruptcy or insolvency of the <u>Insured Organization</u>.

(Landmark Policy (Dkt. No. 43-1) at 33 (emphases in original to represent defined terms))

       Because the adversary proceedings are not "[b]rought or maintained on or behalf of [a] creditor or debt-holder" of Oaktree, but rather by the Bankruptcy Trustee, Paragraph 3 of the Exclusion is not applicable.

       The relevant inquiry under the Exclusion is thus whether the adversary proceedings constitute a "<u>Claim</u> . . . [a]lleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part" either (1) "any <u>Wrongful Act</u> that is alleged to have caused, directly or indirectly, in whole or in part" Oaktree's insolvency or bankruptcy as set forth in clause 1(a); or (2) "the <u>Insured Organization</u> having sustained a

financial loss due to a <u>Wrongful Act</u> by or on behalf of any <u>Insured Person</u> that actually or allegedly occurred before the date that the <u>Insured Organization</u> or other party sought protection of the <u>Insured Organization['s]</u> assets by any means," as set forth in clause 2.  (<u>Id.</u>)

As discussed above, "<u>Claim</u>" is defined in the Policy as (1) [a] written demand for monetary or non-monetary relief; or (2) [a] civil, criminal, administrative, regulatory or arbitration proceeding, or arbitration demand for monetary or non-monetary relief which is commenced by [r]eceipt or service of a complaint or similar pleading."  (<u>Id.</u> at 42 (list formatting and numbering altered))  "All <u>Claims</u> based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions, or events, or the same or related series of facts, circumstances, situations, transactions or events, shall be deemed to be a single <u>Claim</u> for all purposes under [the Policy]." (<u>Id.</u> at 15)

In <u>XL Specialty Ins. Co. v. Agoglia</u>, the court (1) considered similar policy language defining the word "claim," and (2) analyzed the phrase "arising out of."  <u>See</u> No. 08 CIV.3821(GEL), 2009 WL 1227485 (S.D.N.Y. Apr. 30, 2009), <u>reconsideration partially granted on other grounds sub nom.</u> <u>Murphy v. Allied World Assur. Co.</u>, No. 08 CIV. 3821 (GEL), 2009 WL 1528527 (S.D.N.Y. May 29, 2009), and <u>aff'd sub nom.</u> <u>Murphy v. Allied World Assur. Co. (U.S.)</u>, 370 F. App'x 193 (2d Cir. 2010).  Similar to the policy at issue here, the excess policies in <u>Agoglia</u> defined "claim" to mean, in relevant part, a "written demand for monetary or non-monetary relief," a "civil proceeding," or a "criminal proceeding."  <u>XL Specialty Ins. Co. v. Agoglia</u>, No. 8 Civ. 3821 (GEL), Dkt. No. 34-16 at 2 and Dkt. No. 34-21 at 4 (S.D.N.Y.) (full text of policy provisions); <u>see</u> 2009 WL 1227485 at *8.  The policies contained "prior knowledge" exclusions, which barred coverage for any "claim or claims made against the

39

Insureds alleging, arising out of, based upon, in consequence of, or attributable to facts and

circumstances of which any Insured had knowledge as of inception."  Agoglia, 2009 WL

1227485 at *3 (emphases and list numbering omitted).

    After excess insurers denied D&O coverage for civil and criminal proceedings

based on the "prior knowledge" exclusion, the insurers and insureds sought declaratory

judgments regarding the applicability of that exclusion.

    In construing "claim" and "arising out of," the Agoglia court noted that,

> [a]ccording to the Policies themselves . . . a "claim" is defined as a legal
> proceeding and not, as the insureds would have it, as each separate portion of a
> complaint specifying the legal theories defining a cause of action or the relief the
> plaintiff seeks.
>
> . . . . In the context of other types of insurance, New York courts have given the
> phrase "arising out of" a "broad" interpretation, defining it as "originating from,
> incident to, or having connection with."  Maroney v. New York Cent. Mut. Fire
> Ins. Co., 5 N.Y.3d 467, 472 (2005).  This broad interpretation, the Maroney court
> reasoned, would allow an insurer to reasonably define the "universe of
> possibilities to which it can apply its risk analysis methods" so as to appropriately
> determine its premium.  Id.
>
> It is therefore sufficient that the insurers have analyzed the operative complaints
> in each of the Underlying Matters to determine whether each lawsuit, as a whole,
> arises out of the acts, errors, omissions, facts, matters or circumstances of which
> [the insured company's then-CEO] had prior knowledge.  If, as the insureds
> assert, some of the claims in the [underlying actions] could be said to arise out of
> an entirely separate fraud from the one to which [the insured company's then-
> CEO] pled guilty, this would not be fatal to the insurers' position so long as the
> suit as a whole arises from the fraud of which [the insured company's then-CEO]
> had knowledge.

2009 WL 1227485 at *8-9 (Maroney citation altered; footnotes and further citations omitted).

    The same reasoning applies here.  "Claim" is defined to include "a civil

proceeding" (Landmark Policy (Dkt. No. 43-2) at 42), and the adversary proceedings are civil

proceedings.  Therefore, the Bankruptcy/Insolvency Exclusion applies if the adversary

proceedings, "as a whole," Agoglia, 2009 WL 1227485 at *9, "[a]lleg[e], aris[e] out of, [are]

based upon, [are] attributable to, or in any way involve[e], directly or indirectly, in whole or in part" allegations that Daileader caused Oaktree's bankruptcy or insolvency or caused Oaktree to incur a financial loss.  (Landmark Policy (Dkt. No. 43-1) at 33)  Moreover, the Landmark Policy provides that "[a]ll <u>Claims</u> based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions, or events, or the same or related series of facts, circumstances, situations, transactions or events, shall be deemed to be a single <u>Claim</u> for all purposes under [the Policy]." (<u>Id.</u> at 15)

The amended adversary complaints allege that Daileader "made no attempt to coordinate a sale or refinance of [Oaktree] and did not even begin a corporate restructuring," and that – once it was clear that Oaktree would have to file for bankruptcy protection – Daileader failed to steer Oaktree into a Chapter 11 reorganization, rather than a Chapter 7 liquidation.  <u>Fort v. Daileader</u>, Adv. Proc. 21-80057-hb, Am. Cmplt. (Dkt. No. 33) at 2 (Bankr. D.S.C.); <u>see also</u> <u>id.</u> ¶¶ 40, 93-94, 102-03, 149, 159.  Considered as a whole, the adversary proceedings thus allege that Daileader "caused, directly or indirectly, in whole or in part" Oaktree's bankruptcy. (Landmark Policy (Dkt. No. 43-1) at 33)

The amended adversary complaints further allege that Daileader wrongfully caused Oaktree to incur millions of dollars in unnecessary professional fees and that "[o]n Mr. Daileader['s] watch, [Oaktree's] total assets fell from approximately $11.8 million on July 1, 2018 to approximately $6.8 million on August 1, 2019.  Total liabilities increased from approximately $27 million to approximately $39 million during the same period."  <u>Fort v. Daileader</u>, Adv. Proc. 21-80057-hb, Am. Cmplt. (Dkt. No. 33) at 2, ¶¶ 73, 76, 104 & n.13, 113, 147, 169, 209 (Bankr. D.S.C.).  In short, the amended adversary complaints allege that Oaktree

"sustained a financial loss due to a <u>Wrongful Act</u> by on or behalf of [Daileader] that actually or allegedly occurred before" Oaktree's bankruptcy filing.  (Landmark Policy (Dkt. No. 43-1) at 33)

Based on the current record, the adversary proceedings appear to present claims that trigger the Bankruptcy/Insolvency Exclusion.

In the alternative, even if the exclusion analysis were to be conducted on an allegation-by-allegation or cause-of-action-by-cause-of-action basis – rather than at the level of the adversary proceedings as a whole – as long as at least some claims are within the scope of the Bankruptcy/Insolvency Exclusion, Daileader would not be entitled to coverage of all defense costs.  This is because of the Policy's "allocation clause," which provides as follows:

> If both <u>Loss</u> covered under this policy and loss not covered under this policy are jointly incurred either because a <u>Claim</u> includes both covered and non-covered matters or covered and non-covered causes of action or because a <u>Claim</u> is made against both an <u>Insured</u> and any other parties not insured by this policy, then the <u>Insured</u> and the <u>Insurer</u> shall use their best efforts to fairly and reasonably allocate payment under this policy between covered <u>Loss</u> and non-covered loss based on the relative legal exposures of the parties with respect to covered and non-covered matters or covered and non-covered causes of action.
>
> If the <u>Insurer</u> and the <u>Insured</u> agree on an allocation of <u>Defense Expenses</u>, based on covered and non-covered matters or persons, the <u>Insurer</u> shall advance <u>Defense Expenses</u> allocated to covered <u>Loss</u>.  If there is no agreement on an allocation of <u>Defense Expenses</u>, the <u>Insurer</u> shall advance <u>Defense Expenses</u> that the <u>Insurer</u> believes to be covered under this policy until a different allocation is negotiated, arbitrated, or judicially determined.

(Landmark Policy (Dkt. No. 43-1) at 16)

Under the allocation clause, unless every allegation in the adversary proceedings falls outside the Bankruptcy/Insolvency Exclusion – which does not appear to be the case – Daileader is entitled to only a partial defense by Syndicate 1861.  And if he and Syndicate 1861 cannot agree on which allegations are excluded, Syndicate 1861 is required to advance only fees and costs that it "believes to be covered under [its] policy until a different allocation is negotiated, arbitrated, or judicially determined."  (<u>Id.</u>)  Here, of course, Daileader seeks an

42

injunction requiring Syndicate 1861 to "defend him and pay [all of] his defense expenses as and when they are incurred." (Pltf. Br. (Dkt. No. 42) at 6; see id. at 20 ("[I]f an underlying claim contains a <u>single</u> <u>allegation</u> that is potentially covered, the insurance company must defend the entire action.") (emphasis in original), 23-24)

For all these reasons, this Court concludes that Daileader has not demonstrated that the Bankruptcy/Insolvency Exclusion is inapplicable.

### b.   <u>Daileader's Arguments</u>

Daileader makes three arguments as to why the Bankruptcy/Insolvency Exclusion is not applicable to the adversary proceedings. None is persuasive.

Citing several New York state cases, Daileader first argues that "'[i]f any portion of a complaint might result in coverage, the insurer must defend or pay defense expenses for all claims, both covered and non-covered.'" (Pltf. Br. (Dkt. No. 42) at 24 (quoting <u>Fed. Ins. Co. v. Tyco Int'l Ltd.</u>, No. 600507/03, 2004 WL 583829, at *6 (N.Y. Cnty. Sup. Ct. Mar. 5, 2004)); <u>see</u> <u>id.</u> at 23-24 (citing <u>Seaboard</u>, 64 N.Y2d at 310; and <u>Kozlowski</u>, 18 A.D.3d at 40-42)) According to Daileader, the adversary proceedings contain allegations that might result in coverage, because (1) "the Trustee plainly alleges that the Debtors were already insolvent when Mr. Daileader was appointed as an Independent Director and Manager of Oaktree and that Daileader breached his fiduciary duties and was negligent <u>by failing to file</u> for Chapter 11 bankruptcy – <u>not by causing</u> a bankruptcy filing" as required to trigger clause 1(a) of the Bankruptcy/Insolvency Exclusion; and (2) "the Trustee asserts claims and causes of action that do not allege or assert any 'financial loss' to Oaktree," as required to trigger clause 2 of the Bankruptcy/Insolvency Exclusion, "including the Ninth Cause of Action for a bankruptcy preference regarding alleged 'professional fees' paid to Mr. Daileader in the one year prior to Oaktree's petition date." (<u>Id.</u> at 26-27 (emphases in original))

This argument is unpersuasive for multiple reasons.  As an initial matter, Daileader ignores the fact that the amended adversary complaints allege that he failed to explore a sale or restructuring outside of bankruptcy.  Fort v. Daileader, Adv. Proc. 21-80057-hb, Am. Cmplt. (Dkt. No. 33) at 2, ¶¶ 40, 93-94, 149 (Bankr. D.S.C.).  It is therefore not accurate that the entire thrust of the amended adversary complaints is that Daileader failed to file for Chapter 11 bankruptcy protection.

Moreover, the Bankruptcy/Insolvency Exclusion applies to claims alleging that Daileader "caused, directly or indirectly, in whole or in part" Oaktree's bankruptcy or insolvency.  (Landmark Policy (Dkt. No. 43-1) at 33)  Courts have interpreted "caused directly or indirectly" to mean "contributed to," not "caused exclusively" or "a but-for cause of."  See Cali v. Merrimack Mut. Fire Ins. Co., 43 A.D.3d 415, 417 (2d Dept. 2007) (holding that exclusion for property damage caused "directly or indirectly" by earth movement applied "even though the movement was precipitated, at least in part, by decayed wood in the earth beneath the foundation slab"); Shiffler v. Equitable Life Assur. Soc. of U.S., 838 F.2d 78, 84 (3d Cir. 1988) ("[I]f the policy contains an additional clause precluding recovery if the death was caused directly or indirectly by disease, there can be no recovery if pre-existing disease contributed to the death."); Holman v. Life Ins. Co. of N. Am., 533 F. Supp. 3d 502, 510-11 (S.D. Tex. 2021) (policy language excluding coverage for "any loss which directly or indirectly, in whole or in part, is caused by or results from . . . disease" bars coverage even when "a covered risk – [a] car crash – [was] the proximate and more immediate precipitating cause") (emphasis in original).

Finally, the New York state cases cited by Daileader for the proposition that an insurer must defend an entire action in which any allegation in the complaint is covered do not apply here, because of the Policy's definition of "claim" and the Policy's allocation clause.  As

discussed above, because of these Policy provisions, (1) the adversary proceedings must be considered as a whole, and fall entirely within the Bankruptcy/Insolvency Exclusion; or (2) in the alternative, Daileader is entitled to – at most – advancement of defense costs for covered allegations.  The default rules of New York insurance law are of no moment given these provisions, because "'parties to an insurance arrangement may generally contract as they wish, and the courts will enforce their agreements without passing on the substance of them.'" Spandex House, Inc. v. Hartford Fire Ins. Co., 407 F. Supp. 3d 242, 259 (S.D.N.Y. 2019) (quoting J.P. Morgan Sec. Inc. v. Vigilant Ins. Co., 21 N.Y.3d 324, 334 (2013)).[10]

Daileader argues, however, that "Syndicate 1861 . . . cannot meet its burden of proving that the Bankruptcy/Insolvency Exclusion unambiguously applies and that all the allegations of the Adversary Proceedings fall solely and entirely within the Bankruptcy/Insolvency Exclusion, because the Primary Policy expressly provides coverage enhancements that cover the types of claims asserted by the Trustee."  (Pltf. Br. (Dkt. No. 42) at 27 (emphases in original))  Daileader cites three such "enhancements": (1) the limiting language in the "insured v. insured" exclusion providing that a bankruptcy trustee is not an "insured" for purposes of that exclusion; (2) the limiting language in the "criminal or deliberate fraudulent act" exclusion providing that the exclusion does not apply until there is an adverse "judgment or other final adjudication"; and (3) the identical "judgment or other final adjudication" limiting language in the "improper profit" exclusion.  (Id. at 27-28 (quoting and citing Landmark Policy (Dkt. No. 43-1) at 43-44))  Daileader argues that because at least some of the adversary proceedings'

---

[10]  Multiple courts have found allocation clauses with nearly identical language unambiguous and not contrary to public policy.  See Hous. Auth. of New Orleans v. Landmark Ins. Co., No. CV 15-1080, 2016 WL 772649, at *4-6 (E.D. La. Feb. 29, 2016); Com. Cap. Bankcorp. Inc. v. St. Paul Mercury Ins. Co., 419 F. Supp. 2d 1173, 1182-85 (C.D. Cal. 2006).

allegations could fall within those exclusions, the limiting language in these exclusions applies, even though Syndicate 1861 has invoked the Bankruptcy/Insolvency Exclusion.  (Id. at 28-29)

        The limiting language Daileader cites does not apply here, both because Syndicate 1861 has not invoked any of the exclusions Daileader cites, and because – as explained above – the adversary proceedings fall within the scope of the Bankruptcy/Insolvency Exclusion.  Under New York law, "the fact that another exclusion may have been inconsistent with [the exclusion on which an insurer relies] is irrelevant.  '[P]olicy exclusions are to be read seriatim and, if any one exclusion applies, there is no coverage since no one exclusion can be regarded as inconsistent with another.'"  Sampson v. Johnston, 272 A.D.2d 956, 956 (4th Dept. 2000) (quotation omitted) (quoting Hartford Acc. & Indem. Co. v. A.P. Reale & Sons, Inc., 228 A.D.2d 935, 936 (3d Dept. 1996)) (brackets in Sampson); see also 2 Couch on Ins. § 22:2 ("A specific exemption will not be held limited by a subsequent qualified limitation if the two clauses apparently are independent and were not intended to qualify each other.").

        For example, in Fordec Realty Corp. v. Travelers Excess & Surplus Lines Co., No. 18-CV-85 (ALC) (KNF), 2020 WL 6530889 (S.D.N.Y. Aug. 3, 2020), report and recommendation adopted, No. 1:18-CV-00085 (ALC), 2020 WL 5759021 (S.D.N.Y. Sept. 28, 2020), a rusted girder caused the partial collapse of insured's building.  The insurer denied coverage pursuant to a "rust or corrosion" exclusion.  The court rejected the insured's argument that the "hidden decay" limitation to the "collapse of buildings" exclusion – which the insurer had not invoked – applied to the "rust or corrosion" exclusion where the rust at issue was "hidden from view."  The court granted summary judgment for the insurer.  Id. at *9–10; see 2020 WL 5759021 at *3-4 (adopting recommendation to grant summary judgment).

The same analysis applies here.  Unlike the exclusions Daileader cites, the Bankruptcy/Insolvency Exclusion contains neither a carve-out for claims by a trustee nor a final judgment requirement.  Given that (1) Syndicate 1861 has not relied on the "insured v. insured" exclusion, the criminal or deliberate fraudulent act exclusion, or the improper profit exclusion to deny coverage; and (2) as explained above, the adversary proceedings fall within the Bankruptcy/Insolvency Exclusion, the limiting language found in other exclusions is irrelevant.

In arguing that an exclusion can be limited by language in another exclusion, Daileader cites Dupree v. Scottsdale Ins. Co. ("Dupree II"), 957 N.Y.S.2d 263 (Table) (N.Y. Cnty. Sup. Ct. 2012), aff'd, 100 A.D.3d 467 (1st Dept. 2012).  (See Pltf. Br. (Dkt. No. 42) at 29) In Dupree II, the insurer had denied a defense for the insured's officers under the "application exclusion," which applied when the insured had lied on the insurance application, and the "prior knowledge exclusion," which applied to claims the insured knew about before the policy was issued.  In issuing an injunction requiring the insurer to pay defense costs, the trial court found that (1) the application exclusion "turn[ed] on the very facts at issue in the criminal and civil proceedings," which were then unresolved; and (2) the prior knowledge exclusion "may or may not be limited by a severance provision stating that the knowledge possessed by any insured is not to be imputed to any other insured."  Id.  And – in the passage on which Daileader relies – the court states that the two exclusions cited by the insurer "may [have been] circumscribed by" a "final judgment" requirement in a third exclusion regarding fraudulent or criminal conduct, which the insurer had not invoked.  Id.

Dupree II is not persuasive here.  Because the court had already stated sufficient reasons why the exclusions did not apply, the passage stating that limiting language in another

exclusion might apply is <u>dicta</u>.  And while the First Department affirmed in <u>Dupree II</u>, it did not

address the grounds relied on by Daileader here.  <u>See</u> 100 A.D.3d 467.

   Finally, Daileader argues that "even if certain allegations in the Adversary

Proceedings fell within the terms of the Bankruptcy/Insolvency Exclusion, the applicability of

the exclusion cannot be resolved until the Adversary Proceedings are resolved.  That is because

Syndicate 1861's argument that the Bankruptcy/Insolvency Exclusion applies depends on factual

issues that may only be adjudicated in the Adversary Proceedings."  (Pltf. Br. (Dkt. No. 42) at

31)  This argument is likewise not persuasive, because the duty to defend depends on the

allegations in the underlying complaint, and not on whether those allegations are ultimately

proven true.  <u>See</u> <u>Kozlowski</u>, 18 A.D.3d at 41 ("The ultimate validity of the underlying

complaint's allegations is irrelevant.  'The existence of the duty is dependent upon whether

sufficient facts are stated so as to invoke coverage under the policy.'") (quoting <u>Am. Home

Assur. Co. v. Port Auth. of New York & New Jersey</u>, 66 A.D.2d 269, 278 (1st Dept. 1979)).

*  *  *  *

   For all these reasons – based on the current record – the adversary proceedings

fall within the scope of the Bankruptcy/Insolvency Exclusion.  Daileader has not made a clear

showing of a likelihood of success on the merits, or even presented serious questions going to the

merits.

   **2.**   **Whether the Bankruptcy/Insolvency Exclusion**
       **<u>Is an Unlawful *Ipso Facto* Clause</u>**

   Daileader argues that – even if the Bankruptcy/Insolvency Exclusion applies to

the adversary proceedings – it is "void <u>ab initio</u>" as an unlawful <u>ipso</u> <u>facto</u> clause under 11

U.S.C. §§ 365(e)(1) and 541(c).  (Pltf. Br. (Dkt. No. 42) at 32-35)  "An <u>ipso</u> <u>facto</u> clause is a

clause in a contract or lease 'that modif[ies] the relationship of contracting parties due to the

48

filing of a bankruptcy petition.'  Although generally disfavored, such clauses are not per

se invalid in the Second Circuit, except where contained in an executory contract or unexpired

lease."  In re 1111 Myrtle Ave. Grp., 598 B.R. 729, 737 n.3 (Bankr. S.D.N.Y. 2019) (quoting In

re AMR Corp., 730 F.3d 88, 105 (2d Cir. 2013)) (further citations omitted) (brackets in 1111

Myrtle Ave. Grp.).

       The parties have not cited, and the Court has not found, any Second Circuit or

New York case analyzing whether a bankruptcy/insolvency exclusion is an unlawful ipso facto

clause.[11]

### a.      Whether the Exclusion Violates 11 U.S.C. § 365(e)(1)

       11 U.S.C. § 365(e)(1) provides:

> Notwithstanding a provision in an executory contract or unexpired lease, or in
> applicable law, an executory contract or unexpired lease of the debtor may not be
> terminated or modified, and any right or obligation under such contract or lease
> may not be terminated or modified, at any time after the commencement of the
> case solely because of a provision in such contract or lease that is conditioned on
>
> > (A) the insolvency or financial condition of the debtor at any time before
> > the closing of the case;
> >
> > (B) the commencement of a case under this title; or
> >
> > (C) the appointment of or taking possession by a trustee in a case under
> > this title or a custodian before such commencement.

       While the Bankruptcy Code does not define the term "executory contract," "[t]he

generally accepted definition of an executory contract in bankruptcy . . . is 'a contract under

which the obligation of both the bankrupt and the other party to the contract are so far

---

[11]  Syndicate 1861 contends that in CT Inv. Management Co., LLC v. Chartis Specialty Ins. Co.,
130 A.D.3d 1, 7 (1st Dept. 2015) and Coregis Ins. Co. v. American Health Found., 241 F.3d 123,
131 (2d Cir. 2001) courts "applied exclusions similar to the Bankruptcy/Insolvency Exclusion to
preclude coverage."  (Def. Opp. (Dkt. No. 45) at 34)  Neither case involves a contract with a
party that sought protection under the U.S. Bankruptcy Code, however.  Accordingly, these cases
do not involve the same ipso facto clause analysis necessary here.

unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.'" In re Ames Dep't Stores, Inc., No. 93 CIV. 4014 (KMW), 1995 WL 311764, at *3 (S.D.N.Y. May 18, 1995)  (quoting Vern Countryman, Executory Contracts in Bankruptcy, Part I, 57 Minn. L. Rev. 439, 460 (1973)).

Applying this definition, "[c]ourts considering insurance policies in which the policy periods have expired and the initial premiums have been paid routinely find that they are not executory contracts despite continuing obligations on the part of the insured." Id. (citing cases); accord In re Vanderveer Ests. Holding, LLC, 328 B.R. 18, 25–26 (Bankr. E.D.N.Y. 2005), aff'd sub nom. Am. Safety Indem. Co. v. Off. Comm. of Unsecured Creditors, No. 05 CV 5877 ARR, 2006 WL 2850612 (E.D.N.Y. Oct. 3, 2006); In re Grace Indus., Inc., 341 B.R. 399, 402–03 (Bankr. E.D.N.Y. 2006), aff'd as modified sub nom. Admiral Ins. Co. v. Grace Indus., Inc., 409 B.R. 275 (E.D.N.Y. 2009); see also 2 Norton Bankr. L. & Prac. 3d § 46:9 ("[A]n insurance policy is not an executory contract when the premiums have been paid in full, and the policy period has expired, despite any continuing obligations on the part of the insured debtor.").

At the preliminary injunction hearing, this Court asked Daileader's counsel if he was "aware of any Second Circuit law holding that, if an insured has paid a policy premium prior to a bankruptcy filing, that policy is an executory contract under 11 [U.S.C. §] 365(e)(1)." Daileader's counsel responded that he was "not aware of a case that holds that."  (Feb. 8, 2023 Tr. (Dkt. No. 75) at 19)

At the time of Oaktree's bankruptcy filing, Oaktree had paid the Syndicate 1861 policy premiums in full.  (Feb. 2, 2023 Broker Email (Dkt. No. 70-3) (showing broker's records of premium payments on October 31, 2018 and August 12, 2019))  Accordingly, the Syndicate 1861 policy is not an executory contract, and Section 365(e)(1) does not apply here.

Daileader cites <u>In re Cmty. Mem'l Hosp.</u>, No. 16-CV-14434, 2019 WL 3296994, at *3-5 (E.D. Mich. July 23, 2019) for the proposition that a bankruptcy/insolvency exclusion in a D&O insurance policy violates Section 365(e)(1).  (Pltf. Br. (Dkt. No. 42) at 35)  <u>Community Memorial Hospital</u> involves a different issue, however:  whether Section 365(e)(1)'s prohibition on <u>ipso</u> <u>facto</u> clauses applies to a post-petition endorsement to a pre-petition insurance policy. Indeed, the court there noted that "the dispute . . . [was] not so much whether obligations remain unperformed."  2019 WL 3296994 at *3.  In sum, <u>Community Memorial Hospital</u> does not demonstrate that the Policy at issue here is an executory contract.

The Court holds that Daileader has not shown a likelihood of success – or even a serious question going to the merits – on his claim that the Bankruptcy/Insolvency Exclusion violates Section 365(e)(1).

### b.   <u>Whether the Exclusion Violates 11 U.S.C. § 541(c)</u>

11 U.S.C. § 541(c)(1) provides:

Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law –

(A) that restricts or conditions transfer of such interest by the debtor; or

(B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

Because Section 541(c) applies only to "property of the estate," the question here is whether the proceeds of the Syndicate 1861 Policy are proceeds of Oaktree's estate, so as to trigger application of Section 541(c).

Courts in this Circuit have consistently held that, while "[a]n insurance <u>policy</u> issued to a debtor is property of the estate[,]. . . . the <u>proceeds</u> of the insurance policy are property of the estate" only "if depletion of those proceeds will adversely affect the estate."  <u>In re Rochester Drug Coop., Inc.</u>, No. BR 20-20230-PRW, 2021 WL 1093966, at *2 (Bankr. W.D.N.Y. Mar. 22, 2021) (citations omitted; emphases in original).  "Courts that have addressed whether the proceeds of a liability insurance policy are property of the estate are guided by the language and scope of the specific policies at issue."  <u>In re MF Glob. Holdings Ltd. ("MF Global II")</u>, 515 B.R. 193, 202 (Bankr. S.D.N.Y. 2014) (quotation omitted).  When "D&O [p]olicies . . . provide coverage to both . . . [i]ndividual [i]nsureds and the [corporate debtor,] . . . courts have held that the proceeds will be property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution."  <u>Id.</u> at 203 (quotation omitted).

In determining whether depletion of the proceeds of a policy will affect the estate, courts consider whether the debtor's right to the proceeds is immediate or speculative.  <u>See In re Adelphia Commc'ns Corp.</u>, 298 B.R. 49, 53 (S.D.N.Y. 2003) (holding that debtor had no property interest in the proceeds of a D&O policy that covered the debtor's costs in indemnifying directors and officers, because the debtor had not made or committed itself to make indemnification payments; noting that finding a property interest under such circumstances "would be akin to a car owner with collision coverage claiming he has the right to proceeds from his policy simply because there is a prospective possibility that his car will collide with another tomorrow").

Here, the Syndicate 1861 Policy provides coverage both to directors and officers and to Oaktree, with directors and officers receiving priority payment.  (Landmark Policy (Dkt.

No. 43-1) at 41-42, 45)  Therefore, any payments by Syndicate 1861 to directors and officers would deplete the proceeds available to Oaktree's estate.  The question is thus whether Oaktree's estate has a right to the policy proceeds that is more than speculative and rises to the level of a property interest.

Oaktree's estate could conceivably have a property interest in Policy proceeds that it may receive in satisfaction of a judgment against Daileader or a settlement with Daileader resulting from the adversary proceedings.  However, a plaintiff generally does not have a property interest in the proceeds of a defendant's liability insurance proceeds until the defendant's liability has been established.  See In re MF Glob. Holdings Ltd. ("MF Global I"), 469 B.R. 177, 195-96 (Bankr. S.D.N.Y. 2012) ("[Claimants] have not conclusively established that the Debtors or the Individual Insureds are liable for any wrongdoing that would be covered by the Policies.  Therefore, [Claimants] do not have a vested right in any of the proceeds of the Policies."); In re Fort Worth Osteopathic Hosp., Inc., 387 B.R. 706, 712-15 (Bankr. N.D. Tex. 2008) (holding that debtor's trustee, who had filed an adversary proceeding against debtor's directors and officers, did not have a property interest in the proceeds of debtor's D&O policy until liability was determined; accordingly, Section 541(c) did not apply).

At the preliminary injunction hearing, Daileader conceded that he knew of no Second Circuit law to the contrary.  (Feb. 8, 2023 Tr. (Dkt. No. 75) at 20 ("THE COURT:  Are you aware of any Second Circuit law holding that, where a bankruptcy trustee has sued a director or officer. . . , and judgment [] has not yet been entered, the proceeds of the D&O [policy are] property of the bankruptcy [estate] for the purposes of 11[U.S.C. § ] 541(c)?  MR. MASCIA:  I'm not aware of a case specifically on that issue."))

Because there has been no judgment against Daileader in the adversary proceedings, any right that Oaktree's estate has to the proceeds of the Syndicate 1861 policy – as a result of the adversary proceedings – is too attenuated to constitute a property interest under Section 541(c).

Oaktree's estate could also conceivably have a property interest in the proceeds of the Syndicate 1861 Policy in connection with its costs in defending the Rauch Action.  (Rauch Action Cmplt. (Dkt. No. 79-19))  Daileader states, however, that the Rauch Action "has been stayed in light of [Oaktree's] pending bankruptcy."  (Pltf. Supp. Br. (Dkt. No. 77) at 16)  Accordingly, it is not clear from the current record (1) whether Rauch has filed or will file a claim or adversary proceeding in the Oaktree bankruptcy; (2) whether the claims in the Rauch Action are debts that will be discharged in bankruptcy; (3) if, or when, the stay will be lifted; or (4) whether Oaktree has requested coverage from Syndicate 1861 in connection with the Rauch Action, or what Syndicate 1861's response to such a request is or would be.[12]  Moreover, the Bankruptcy Court is familiar with the Rauch Action and has stated that "any lower priority claims the Debtors may have under the policy are purely speculative."  In re Oaktree Medical Centre, LLC, No. 19-05154-HB, Nov. 9, 2021 Order (Dkt. No. 125) at 5 (Bankr. D.S.C.); see id. at 3 (noting the Rauch Action).  In sum, the current record does not demonstrate that the Oaktree estate's interest in the Syndicate 1861 Policy proceeds with respect to the Rauch Action rises to the level of a property right.

Daileader argues, however, that Section 541(c) applies to the Bankruptcy/Insolvency Exclusion, citing Yessenow v. Exec. Risk Indem., Inc., 953 N.E.2d 433

---

[12]  While Landmark agreed to defend Oaktree and its officers in the Rauch Action (June 6, 2019 Landmark Ltr. (Dkt. No. 79-20)), as the instant case makes clear, Syndicate 1861 is willing to deviate from Landmark's coverage determinations.

(Ill. App. 2011), in which the court held that a bankruptcy/insolvency exclusion in a D&O

insurance policy was an unlawful ipso facto clause under Section 541(c).  (Pltf. Br. (Dkt. No. 42)

at 33-34)  In Yessenow, as here, the debtors' former directors and officers – who had been sued

by the bankruptcy trustee in an adversary proceeding – sought a declaratory judgment that the

debtors' D&O insurer had a duty to defend them, notwithstanding the policy's

bankruptcy/insolvency exclusion.  Yessenow, 953 N.E.2d at 435-37.

      The Yessenow court concluded that

> [t]he D&O policy at issue in this case is an asset of the bankruptcy estate, and the
> trustee cannot obtain the possible benefits of indemnity for the insureds'
> wrongdoing without permitting the named insureds to access the defense costs
> under that policy.  The trustee has acknowledged this in his response to [the
> D&O] plaintiffs' motion for a temporary restraining order, claiming that [the
> D&O] plaintiffs' right to coverage under the policy is clear.  Although coverage
> inures to the benefit of [the D&O] plaintiffs, it arises from the D&O policy which
> has become a property interest of . . . the debtors.  Therefore, that property interest
> is protected by [S]ection 541(c), and because any benefit to the estate will be
> realized only if plaintiffs may seek coverage under it, they have standing to
> challenge the exclusion.

Id. at 439.

      The Yessenow court cites no case law in support of its holding, and does not

discuss whether a judgment as to a defendant's liability is necessary to establish a plaintiff's

property interest in the defendant's insurance proceeds.  This Court therefore gives more weight

to MF Global I and Fort Worth Osteopathic Hospital, both of which – as discussed above – hold

that a judgment is required to establish a property right.  Accordingly, this Court will not follow

Yessenow's holding as to Section 541(c).

      Daileader further argues that Oaktree's estate has a property interest in the

Syndicate 1861 Policy proceeds because of the Rauch Action.  (Pltf. Supp. Br. (Dkt. No. 77) at

16)  This Court rejects that argument for the reasons stated above.

Finally, Daileader argues that Syndicate 1861 has previously "admi[tted] that the Debtors have a property interest in the proceeds" of the Policy.  (Pltf. Supp. Br. (Dkt. No. 77) at 17)  But Syndicate 1861's opposition brief says only that

> the Excess Insurers are . . . placed in a precarious situation if an insured, but not the named insured, forces the Excess Insurer into a position where a preliminary injunction has been filed, the Excess Insurer is forced to unnecessarily defend a claim against the insured, the policy limits are exhausted, and then a claim is filed against the named insured.  At this point, the named insured, and the one who is paying the premiums, would unjustifiably not be provided a defense.  This would cause unnecessary hardship on the insurer.

(Def. Opp. (Dkt. No. 45) at 40; see also Def. Opp. to Prior Prelim. Injunction Mot. (Dkt. No. 22) at 33 (same))  Referring to a potential future claim is not tantamount to admitting that the estate currently has a property interest in the proceeds of the Policy.

The Court concludes that Daileader has not shown a likelihood of success on his claim that the Bankruptcy/Insolvency Exclusion violates Section 541(c).

\*       \*       \*       \*

Because Daileader has not shown a likelihood of success concerning his arguments that (1) the adversary proceedings are outside the scope of the Bankruptcy/Insolvency Exclusion; and (2) the Bankruptcy/Insolvency Exclusion is an unlawful ipso facto clause, he has not shown a likelihood of success on the merits.

## **CONCLUSION**

For the reasons stated above, Plaintiff Daileader's motion for a preliminary

injunction is denied.  The Clerk of Court is ordered to terminate the motion (Dkt. No. 41).

Dated: New York, New York
      April 20, 2023

SO ORDERED.

Paul G. Gardephe
United States District Judge